## STATE v. LEPINE.

Under Rev. Pen. Code, § 268, making homicide justifiable if committed by a person in lawful defense of his person when there is a reasonable ground to apprehend some great personal injury and imminent danger of such design being accomplished, in order to constitute the defense it is not essential that the danger actually exists, but only that there be reasonably grounds to apprehend the existence of such danger; and hence a party may act upon appearances of an assault being made upon her.

In a prosecution for homicide, where the defense was justifiable killing, **held,** a conviction was not sustained by the evidence.

Fuller, P. J., dissenting.

(Opinion filed, December 4, 1907.)

Error to Circuit Court, Lake County. Hon. J. W. Jones, Judge.

Dora Lepine was convicted of homicide and brings error. Reversed, and a new trial ordered.

*Chas. J. Porter* and *Aikens & Judge,* for plaintiff in error. *S. W. Clark, Atty. Gen.,* and *D. D. Holdridge, State's Atty.,* for the State.

CORSON, J. Upon an information duly filed by the state's attorney of Lake county, charging the defendant with the commission of the crime of murder, she was tried and found guilty of manslaughter in the first degree, and sentenced to imprisonment in the state penitentiary for the term of four years. The case is now before us upon a writ of error to the circuit court of Lake county.

It is disclosed by the record that the plaintiff in error, whom we shall hereafter designate the defendant, and the deceased, were husband and wife, and at the time of the homicide were engaged in the business of keeping a house of ill fame. The deceased was killed by the defendant by shooting him with a revolver between 11 and 12 o'clock at night on the 8th of February, 1906, in their bedroom in the house where they resided. No person was present in the bedroom at the time of the shooting, except the defendant and the deceased. The shooting by the defendant was admitted by her, but she claimed that it was done in self-defense. There were three girls occupying rooms in the house, all of whom testified that they heard three shots, two of which were in quick succession, and the last after an interval of a second or two. Very soon after the shooting the defendant was seen by one of the girls to come out of the bedroom, closely followed by the deceased, who fell near the door of the bedroom and expired in a very few minutes after he came from the room. It is further disclosed by the record that early in the morning of February 9th the sheriff of the county was notified, and he, with the coroner, proceeded to the house and there found the body of the deceased on the floor as he had fallen after the shooting, and that the defendant gave him two revolvers, one of which she admitted to have been used by her in the shooting. Numerous errors were assigned

in the record as to the admission and exclusion of evidence and the refusaal of the court to give instructions requested on the part of the defendant; but in the view we take of the case it will only be necessary to discuss the sixth and seventh assignments of error, as the other questions will not necessarily arise on another trial. These errors are, in substance, that the evidence in the case fully justified the defendant, and the verdict is therefore unsupported by the evidence and that the court erred in denying defendants motion for a new trial.

The defendant as witness on her own behalf, in describing the shooting and the cause for the same, testified as follows: "I went back into my bedroom and laid down on the lounge. I was then scared to death of him, and excited for fear he would kill me which he said he would do that night. I had been afraid of him ever since he had the delirium tremens. I did not undress when I went into my bedroom. Ordinarily I had been in the habit of sitting up. I went to bed every night, but got up in the night and watched him. When I laid on the lounge, my head was to the south and to the rise of the lounge. Joe came in in about half an hour. He shut the door and latched it. He sat down and talked to me, and accused me of being in town to see other men. I told him I was not. He got raving mad. He pulled me down to the foot of the lounge and had his knee on my chest. He said: 'You ain't going to holler this time for help! I will fix you so you won't.' He had his hand on my throat and one knee on my chest and he was pounding me with the other hand on the head and side of the head. He made marks upon me. He made me excited and scared to death. I was afraid that he would kill me. I really thought he would kill me. I tried to scream. I made some noise, but he choked me so I could not holler. Then I reached under the lounge, and got this gun, and fired two shots. The gun had been taken away from him a week before by two men, and I hid it under the lounge. He owned two other guns beside that. One I put in the commode, and one was out in the kitchen. I thought he had it all the while. After I reached under there and got hold of the gun, I fired off two shots to scare him. I did not aim at him. I held it down. Then he got up quick.

He let go of me, and he jumped for the commode drawer, and I thought he was going to get that gun there and kill me. Instead of that he got the beer bottle and he held it up over my head. When he was holding up the beer bottle over my head I fired. After I fired this third shot, he turned around part way and said: 'Dora, you have hurt me.' I did not know that I had hit him until he staggered for the chair. I reached for the door, unlocked it quick, and rushed out. He staggered against the door, and followed me out a little ways, and grabbed for me, and I jerked one side. Three or four feet from the door he fell. * * * I was excited, and did not hardly know what I was doing at that time." Much of the testimony of the defendant was corroborated by the evidence of the three girls who were living in the house at the time, and by the testimony of the two physicians who made an examination of the room and as to the position of the deceased at the time he was shot.

The principal question presented therefore, is: Was the defendant justified, under the circumstances, in believing that the defendant intended to kill her, or to do her some great bodily injury, at the time of the shooting, and that there was eminent danger of such design being accomplished? Section 268 of the Revised Penal Code provides: "Homicide is also justifiable when committed by any person in either of the following cases: (2) When committed in the lawful defense of such person * * * when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished." It will be observed by the language of this subdivision of this section that the taking of the life of another is justifiable when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury to the accused, and imminent danger of such design being accomplished. In order to constitute this defense, it is not necessary that the danger actually exists, but only that there shall be reasonable grounds to apprehend the existence of such danger; and a party may therefore act upon appearances of an assault being made upon him or her.

After a careful examination of all the evidence in the case

we are clearly of the opinion that the defendant was fully justified in this case in believing that the deceased either intended to kill her at the time she fired the fatal shot, or was threatening to make an assault upon her calculated to do her great bodily injury. It appears from the undisputed evidence that the deceased, about 2½ months prior to his death, had an attack of delirium tremens, and subsequently to his recovery from that attack indulged very freely in the use of intoxicating liquors up to the time of his death, and that he became insanely jealous of his wife, and used toward her the most vile and abusive language; that on two or three occasions he assaulted her and shot at her with a pistol, and at other times assaulted her and beat her in the most cruel and inhuman manner, and frequently threatened to kill her; that on the afternoon of his death he was unusually excited, and as the defendant returned from town in the afternoon he tried to pull her out of the carriage in which she was riding, subsequently struck the horse, which started up, and threw her down under the carriage, and as the defendant had had the misfortune of losing one of her lower limbs, which had been substituted by an artificial one, the injury to her was serious. It also appears from the evidence that a short time previous to the shooting the deceased dragged his wife from the lounge to the floor, and was engaged in beating her, when she cried for help, and two of the girls came, and kicked in the panel of the door, and helped her up from the floor, and assisted her to the parlor. We shall not attempt in this opinion to reproduce the evidence in the case, as the same is very voluminous, and its reproduction would serve no useful purpose.

The judgment of the court below, and order denying a new trial, are reversed, and a new trial ordered.

FULLER, P. J., dissents.