STATE, Respondent, v. BELL, Appellant.

(160 N. W. 727.)

(File No. 3904.   Opinion filed December 30, 1916.   Rehearing denied February 7, 1917.)

1.  **Criminal, Law—Homicide—Self-defense—Danger, Apparent Danger—Rule of Law.**

That one man has a' right to slay another in rightful self-defense of his own person, or of other's under his protection, has always been recognized by law, and, if circumstances justified the slayer in an honest belief that he is in danger, it is not necessary that such danger should actually exist. If there is reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of said design being accomplished, it is sufficient.

2.  **Same—Self-defense—Deadly Weapon Concealed Upon Deceased—Deceased's Companions Over-aweing Defendant—Insulting Remarks to Defendant's Wife—Deceased's Intent to Provoke Assault.**

Where deceased, accompanied by three neighbors, all on horseback, approached defendant's residence, and deceased demanded that defendant come out of his house and talk with deceased; it appearing that said parties came to defendant's residence for the purpose, and. with the intent, to provoke a serious conflict with defendant, or drive him out of the country, because of trespass of defendant's sheep upon land in which deceased and some of his companions were interested, said companions being apparently in sufficient numbers to overawe and intimidate defendant; it further appearing that deceased prepared in advance for trouble by concealing a deadly weapon, to-wit, a' pistol upon his person; that upon defendant's coming outside and talking with deceased concerning said trespass, deceased said to defendant that he wanted him to take the sheep off, take them back and shut the gate and keep them off, defendant testifying that he also said to him, "We want you to take your God damn sheep and get out of the country and close the gates. Do you understand?"; whereupon, defendant's wife having stated that it was their home and they had a right

to stay there, deceased made use of an extremely offensive and insulting remark concerning the wife's character, whereupon defendant started for the house, and deceased produced a pistol, which had been concealed on his person, and defendant was trying to get away from deceased, who commenced striking him over the head and shoulders with the pistol, being a dangerous weapon, until they were within a few feet of the house door, when defendant struck deceased a blow upon his face with his fist staggering or knocking him down, whereupon defendant stepped into the house, got a shot gun, came outside and stepped to the side of the door, deceased then being on his feet, pistol in hand, and although partially dazed was sufficiently conscious to know what he was doing and where defendant then was; deceased immediately firing his pistol at defendant; the bullet striking the ground in front of him; whereupon defendant raised the shot gun, fired at deceased, killing him almost instantly; held, that the fact of the conduct of deceased, that he had a deadly weapon concealed upon his person and assaulted defendant, warranted defendant in believing that deceased and his companions went to defendant's house for the purpose of and with the intent to provoke a serious conflict with defendant or drive him out of the country; that they were in sufficient numbers to overawe and intimidate defendant; that it was the purpose of deceased to bring on a conflict with defendant, as is further shown by the insulting remark made by deceased concerning defendant's wife, which remark constituted so gross an insult and was so uncalled for and unwarranted that it could have been made with no other purpose than to provoke an assault by defendant upon deceased that would furnish deceased with an excuse for shooting defendant; that in view of all the circumstances, defendant was fully justified in believing that deceased either intended to kill him or was threatening to make an assault upon him calculated to result in great bodily injury; that he acted in apparent necessary self-defense.

3.    Same    Self-defense—Design to Shoot Deceased—Deceased's First Assault, Effect as to Intent—Right to Arm and Repel Assault.
    Under said state of facts, held, that the theory of the state that upon the making of said insulting remark by deceased, defendant immediately formed the design to arm and kill deceased; that deceased surmised this design, and it was to prevent carrying out such design that deceased assaulted defendant with the pistol, is not sustained by the evidence; there being no evidence showing defendant had formed any intention to kill or even attack deceased; defendant had a perfect right to arm and defend himself against the assault that was being made upon him by deceased; that defendant, being on his own prem-

ises and in the midst of his family, and having been violently assaulted with a deadly weapon by deceased, was not called upon to defend himself with his bare hands against a man armed with a deadly weapon and backed by three confederates.

4.  **Same—Assault With Pistol by Deceased—Necessity of Defendant's Retreat—Defense With Shot Gun, Whether Warranted.**
    Nor, in such a case, was defendant, upon being so assaulted by deceased with a deadly weapon, called upon to retreat.

5.  **Same—Self-defense—Deceased's Assault of Defendant—Renewal of Encounter—State's Theory Not Tenable.**
    Nor, in view of all the facts, is the state's contention that defendant was the aggressor in the final conflict and provoked the final assault, tenable; nor, that when defendant struck deceased after being driven back to his house by deceased's assault, the encounter was at an end. On the contrary there was but one encounter, it being but a matter of a few seconds from the time when deceased assaulted defendant until the time when the fatal shot was fired; nor does the evidence show that defendant fired at the first opportunity, nor at all, until after deceased had fired a pistol, and there is nothing indicating that defendant intended to shoot deceased, had deceased not fired the first shot, nor then intended to do more than defend himself, his home and family as far as necessary.

6.  **Same—Self-defense—Right to Arm in Defense of Home—Rule of Law.**
    When a man is unlawfully assaulted, on his own premises, he may arm himself, if he can, and, standing upon his own doorstep, he may defend himself to the last extremity against all assailants.

Appeal from Circuit Court, Perkins County. Hon. RAYMOND L. DILLMAN, Judge.

The defendant, Fred M. Bell, was convicted of manslaughter in the first degree, and appeals. Reversed.

*Harry P. Atwater,* for Appellant.

*Clarence C. Caldwell,* Attorney General, and *Byron S. Payne,* Assistant Attorney General, for Respondent.

(1) To point one of the opinion, Appellant cited: State v. Lepine, 113 N. W. 1076; Wharton on Homicide, Sec. 237; Revised Pen. Code 1903, Sec. 268; 21 Cyc. 800, 802; State v. Zeigler, 40 W. Va. 593, 10 Am. Crim. Rep. 463.

(4) To point four of the opinion Appellant cited: Wharton on Homicide, Third ed., Secs. 279, 306; Boykin v. People, 22 Colo. 496, 45 Pac. 419; State v. Bennett, 128 Iowa, 716, 105

N. W. 324; State v. Linhoff, 121 Iowa, 637, 97 N. W. 77; Palmer
v. State, 9 Wyo. 40, 59 Pac. 793, 87 Amer. St. Rep. 910.

Respondent cited: Wharton on Homicide, p. 451.

. (5) To point five of the opinion, Respondent cited: Reese
v. State, (Tex.) 91 S. W. 583; 1 Mitchie on Homicide, pp. 344,
370, 424; State v. Seery, (Ia.) 105 N. W. 511; People v. Ken-
nedy, 159 N. Y. 346, 54 N. E. 51, 70 A. S. R. 557; Bowles v.
State, (Tex.) 67 S. W. 103; Garner v. State , 34 Tex. Cr. 356,
30 S. W. 782; State v. Petch, 43 S. C. 132; State v. Staum-
baugh, 28 S. D. 50; State v. Neeley, 20 Ia. 109; Reese v. State,
135 Ala. 13, 33 So. 672.

(6) To point six of the opinion, Respondent cited: 1 Mit-
chie on Homicide, p. 415; Wharton on Homicide, p. 494; Wat-
kins v. State, 89 Ala. 82, 8 So. 134.

POLLEY, P. J. Appellant was convicted of manslaughter
in the first degree, and sentenced by the trial court to a term of
14 years in the penitentiary. From this judgment and from an
order denying a new trial, he has appealed to this court.

Numberous errors are assigned upon the admission and
rejection of evidence, the instructions of the court, the refusal to
give requested instructions, and the insufficiency of the evidence
to support the verdict.

Appellant was charged in the information with the killing
of one Claud Herron, in Perkins county, on the 13th day of
May, 1915. Defendant admitted that he killed Hrron, but it is
claimed by defendant that it was done in the necessary defense
of his own person, and was therefore justifiable. The question
whether the homicide was justifiable or not is presented by the
exception to the sufficiency of the evidence, and a determination
of this question requires a review of the testimony.

At the time of the homicide, the appellant was living with
his family on a homestead in Perkins county, and had been
living there for about 4 years. A short time before the homicide,
he and another party had brought a band of sheep into the
neighborhood and were grazing them in that vicinity. The de-
ceased claimed an interest in certain tracts of land in the
vicinity, and objected to having it grazed by said sheep. On
the morning of the homicide, the deceased, in company with
three other parties (Miller, Stillman and Conway), all on horse-

back, rode up to the appellant's house. Miller and Stillman were neighboring ranchers, and Conway was working for the deceased. When within a few feet of the door, the deceased called to defendant, who was in the house, and told him to come outside; that he wanted to talk with him. Appellant replied by saying, "Can't you talk to me just as well where I am?" and his wife asked practically the same question, to which deceased replied, "No; you must come out here." Defendant then went outside, and he and deceased went a short distance from the house. The other three followed up on their horses. They all stopped by some buggies that were standing about 40 feet from the door and the deceased dismounted. A controversy then took place between defendant and deceased regarding the sheep. Deceased claimed that appellant had allowed the sheep to run on the land in question, while appellant claimed that he had been keeping them off said land. Miller also claimed that the sheep had been on land that he was looking after. There is a dispute as to what was said next. Miller (who was a witness for the state) testified that deceased said to defendant:

"I want you to take them sheep off and take them back and shut the gate and keep them off."

The appellant, which on the stand, testified that deceased said:

"We want you to take your God damn sheep and get out of the country. and close the gates. Do you understand?"

This remark appears to have been understood, by defendant's wife at least, as a warning to defendant to take his sheep and get out of the country, for at that point she said:

"It is my home, and we have a right to stay here if we want to."

At that remark the deceased, raising one hand in the direction of defendant's wife, said:

"Don't pay any attention to what she says. I have seen better women come out of whore houses and dance halls than she is."

Upon the making of that remark, the defendant started for the house, and deceased produced a pistol (a 45 caliber Colt's revolver that until then he had had concealed on his person). Whether appellant turned and ran toward the house, or whether he went backward, is a disputed question. The witnesses for

the state testified that he turned and ran, while the appellant testified that he walked backward. It is not material how he went. He was trying to get away from deceased, who immediately upon drawing the revolver had commenced striking appellant over the head and shoulders with it. This pistol is of sufficient size and weight to constitute a dangerous weapon when used as a club as well as when used as a firearm. This continued until they were within a few feet of the door, when an opportunity offered, and defendant struck deceased a heavy blow on the face with his fist. This blow staggered deceased and, according to some of the witnesses, knocked him down. Immediately after striking deceased and as quickly as possible, appellant stepped into the house, got a shotgun, and came outside and took two steps to the right of the door. When defendant came out of the house with the shotgun, deceased was on his feet, with the pistol in his hands. The witnesses for the state testified that, at this time, the deceased was in a partially dazed and unsteady condition, but it is evident that he was sufficiently conscious to know what he was doing, and also knew where defendant was at that time, for, as appellant stepped to the right of the door, deceased fired the pistol; the bullet striking the ground just in front of defendant. Appellant then raised the shotgun and fired at deceased, killing him almost instantly.

[1] Under these circumstances, was the danger, or apparent danger, in which appellant was placed by the assault and demonstration made by the deceased sufficient to warrant the appellant in shooting the deceased? That one man has a right to slay another in the rightful defense of his own person or of others under his protection has always been recognized by the law, and, if the circumstances are such as to justify the slayer in an honest belief that he is in danger, it is not necessary that such danger should actually exist. If "there is reasonable ground to apprehend a design to commit a felony or to do some great personal injury and imminent danger of said design being accomplished" it is sufficient. Section 286, Pen. Code. In Wharton on Homicide (3d Ed.) § 225, the rule is stated as follows:

"The law of self-defense is founded on necessity, and it may be stated generally that, before a homicide can be justified, it must appear that the slayer was in great peril of death or

serious bodily harm or had reasonable ground for believing, and did believe, that he was in such peril, and that the killing was necessary to avert such peril, and that no other reasonable means of avoiding it was open."

And, again, in section 226, the same author says:

"It is the apparent, and not the real, necessity to kill in self-defense against death or great bodily harm which controls the question of justification; in such cases one has the right to act on the reasonable appearance of things. Where one person makes a demonstration against another, the other has the right to act in self-defense, either on actual or apparent danger. The right of self-defense does not depend on the correctness of the slayer's apprehension of apparent danger. It is sufficient that the slayer acted upon reasonable appearance and belief of danger."

[2] Tested by these rules, was it apparently necessary for appellant to take the life of the deceased in order to save himself from great bodily injury?

It will be remembered that deceased was the aggressor in the conflict, and, from the conduct of the deceased, the fact that he had a deadly weapon concealed upon his person and the assault made upon defendant by deceased, defendant would have been warranted in the belief that deceased and his companions went to defendant's house on that occasion for the purpose, and with the intent, to provoke a serious conflict with defendant or to drive him out of the country. They were apparently in sufficient numbers to overawe and intimidate appellant. Deceased prepared in advance for trouble by concealing the deadly weapon upon his person. Had he gone there merely for the purpose of having a talk with appellant, he could have gone alone, and there is nothing to suggest that he would not have been perfectly safe in so doing. Again, had it not been his intention to have serious trouble with appellant, there is no reason why he could not have said what he had to say to appellant in the house. That it was the purpose of deceased to bring on a conflict' with defendant is further shown by the insulting remark made by deceased with reference to defendant's wife. This remark constituted so gross an insult and was so utterly uncalled for and unwarranted by anything that had been said or done that it could have been

made with no other purpose than to provoke an assault by defendant upon deceased that would furnish deceased with an excuse for shooting defendant. It was immediately after the making of this remark that the deceased produced the pistol, and it was then, for the first time, that defendant knew that deceased had a pistol.

[3-6] While the state does not attempt to justify the conduct of deceased up to this point in the controversy, it is the theory of the state that, upon the making of the said insulting remark by deceased, defendant immediately formed the design to arm himself and kill deceased; that deceased surmised this design; and that it was to prevent the carrying out of such design that deceased assaulted defendant with the pistol. One of the witnesses testified that, when defendant started for the house, he called out, "Get the gun," but it does not appear to whom he called, for defendant's wife was no nearer the gun than he was, and there does not appear to have been any one else present who could get the gun. In regard to this contention by the state, suffice it to say: First, there is not a scintilla of evidence to show that the defendant had formed any intention to kill or even attack deceased; and, second, defendant had a perfect right to arm himself and defend himself against the assault that was being made upon him by deceased. Neither is there anything in the record to indicate that had deceased turned and mounted his horse and rode away when defendant started to the house he could not have done so in perfect safety. It must be remembered that defendant was on his own premises, in his own dooryard, and in the midst of his own family. He had been violently assaulted with a deadly weapon by the deceased. Under these circumstances, defendant was not called upon to retreat, nor was he called upon to defend himself with his bare hands against a man, armed with a deadly weapon and backed up by his three confederates. But it is contended by the state that defendant was the aggressor in the final conflict, and that it was he who provoked the final assault. It is claimed by the state that, when defendant struck deceased, the encounter was at an end, and that the defendant left the scene of the combat, armed himself with a shotgun, and deliberately returned with the intention of

renewing the encounter and slaying the deceased. Counsel for the state, in their printed brief, say:

"The appellant stepped out of the house, aimed the gun at deceased, provoked deceased to endeavor to defend himself, and then shot deceased in cold blood."

The evidence does not support any such inference. There was but one encounter. The evidence shows that it was but a matter of seconds from the time deceased assaulted defendant until the fatal shot was fired. There might be some slight ground in support of the state's theory if the defendant had fired from the door as soon as he got the gun, but this he did not do. That he held the gun in readiness to shoot is undoubtedly true, and that he was justified in so holding it will not be questioned; but it is equally true that he did not fire at the first opportunity, nor at all until after deceased had fired the pistol. There is nothing to indicate that the defendant intended to shoot deceased had deceased not fired the first shot, nor that he intended to do more than to arm himself and defend himself and his home and family as far as necessary. It is true that, had defendant shut the door when he went into the house and remained inside, the deceased might not have further molested him. But this defendant was not required to do. When a man is unlawfully assaulted on his own premises he may arm himself, if he can, and, standing upon his own doorstep, as defendant did in this case, he may defend himself to the last extremity against all assailants.

In Palmer v. State, 9 Wyo. 40, 59 Pac. 793, 87 Am. St. Rep. 910, the Supreme Court of Wyoming, in discussing a homicide that took place in the home of the defendant, situated in many respects as the home of the defendant in this case, used the following pertinent language:

"There are many lonely ranches miles away from any help or any safe place of retreat, and they are not infrequently occupied by persons without other protection or defense than that which they can make for themselves. That any man or woman so situated must first look about for means of escape before they can defend themselves against impending danger is not the law. It would not benefit the community or tend to make life safer. We think it is better that it should be clearly stated and understood that one who starts out upon an expedition, which involves

a felonious assault upon another in his own house, takes his life in his hand, and the right to take it from him· depends only upon the apparent necessity which he himself may create. The person so assaulted has the right to defend himself and to pursue his adversary until he has freed himself from all danger."

And, in State v. Lepine, 21 S. D. 500, 113 N. W. 1076, a homicide case, this court, in an opinion by Mr. Justice Corson, after reviewing the evidence, said:

"After a careful examination of all the evidence in the case we are clearly of the opinion that the defendant was fully justified in this case in believing that the deceased either intended to kill her at the time she fired the fatal shot, or was threatening to make an assault upon her calculated to do her great bodily injury."

In that case the judgment of conviction of the defendant was reversed upon the sole ground that the evidence failed to support the verdict. We believe the language used in that case is applicable to the facts in this case. In view of all the circumstances attending the transaction between defendant and deceased, the defendant was fully justified in believing that the deceased either intended to kill him, or was threatening to make an assault upon him calculated to result in great bodily injury.

With this view of the evidence it is not necessary to consider the other assignments.

The judgment and order appealed from are reversed.