STATE, Respondent, v. JAUKKURI, Appellant.

(168 N. W. 1047).

(File No. 4343. Opinion filed Sept. 3, 1918).

1. Homicide—Self-Defense—Warning Another of Danger, Before
Shooting, Whether Evidence of Felonious Design.
. That defendant, charged with homicide, and who defended on

ground that he did the shooting in self-defense, called out to a third person between whom and defendant one C. who was standing, to 'look out," or "step aside," just before he fired tne shot, is not evidence of defendant's felonious design to shoot said person; the state's contention being that he thereby displayed more coolness and deliberation than a man who believed himself the object of a deadly personal assault would exercise. So held, where the evidence tended to show that the person killed, being an employee of a mining company, was at the time in an intoxicated condition and undertaking to pass through a tunnel used by the mining employees and general residents as a passageway between two towns; that defendant was the mining company's night watchman on guard in said tunnel to look after safety of people passing through same, and to see that no person in an intoxicated condition undertook to pass through without an escort; that defendant seeing C coming and believing him to be in an intoxicated condition, followed him into the tunnel at a short distance; that soon thereafter an altercation occurred between C. and defendant, over the effort of the latter to prevail upon C. to cease urinating in the tunnel, C. having struck defendant with a bottle of wine, a vicious fight following in which both parties were considerably hurt; defendant having freed himself and ran toward the tunnel entrance and past one W. who soon came upon C., who showed evidences of cuts on his head, etc., and who declared to W. that defendant had hit him with the butt of his gun and had knocked him down; that W. insisted upon going to the mining time keeper's office with C., who refused such service and started back to the tunnel entrance, on the way to which he conversed with an ore train engineer; that he had a rock or piece of ore in his hand and inquired of the engineer for defendant, who, he said had knocked him down; that defendant after passing W., entered a boiler room near tunnel entrance, without hat, his coat torn, etc.; that, having washed his hands, etc., he asked H., another guard, to go with him into the tunnel; that a short distance enroute they saw C., who immediately started toward them on the run, defendant requesting H. to go ahead of him, which he did; that H. endeavored to catch C., who however passed him at some twenty feet in front of defendant, at which point C. threw a rock at but missed the former; that defendant thereupon drew his pistol and, having given H.the warning above stated, fired at C., killing him instantly. That defendant's presence of mind in warning his friend of danger was not evidence of felonious design.

2.   Same—Honest Belief of Imminent Assault as Affecting—Warning to Friend of Danger, Before Shooting, Effect re Intent.

   If defendant, charged with homicide, were at the time of the

fatal shooting in question, acting upon an honest belief that he
was about to be assaulted by the person shot, he had a right to
use such means as he had at hand to protect himself from the
assault; and the fact that he exercised sufficient presence of
mind to warn his friend, who was then dierctly in line with the
person shot, of possible danger, authorizes no inference that the
danger to defendant was not really apparent.

3.  **Same—Justifiable Resistence—Common Law, Statutes.**

Under common law, and under the statutes of this state, a
person being assaulted may make such resistence as is sufficient
to repel such assault; construing Pen. Code, Sec. 268.

4.  **Same—Second Encounter, Aggressor in First, Materiality Re.**

In determining, in a prosecution for homicide, the question of
self-defense and the circumstances justifying the taking of hu-
man life in repelling dangerous assault, it is not material who
was aggressor in the first encounter, where the fatal shot was
fired in a second encounter, nor was it material as to what was
the result of the first encounter; and, conceding that in a first
encounter defendant, a tunnel guard, struck C upon the head
with the butt of his pistol, the person afterwards shot, such
act did not justifiy the latter in taking the law into his own
hands and renewing the encounter with defendant on sight.

5.  **Same—Necessity of Retreating—Retreat with Safety, Instruction
    Concerning.**

Where, in a trial for homicide, trial court charged that, if
defendant could have retreated with safety it was his duty to do
so, held, that whether or not defendant could have retreated
with safety to himself was thereby submitted to the jury as a
question of fact, and, in order to have found defendant guilty
the jury, following said instruction, must have believed that,
under the circumstances, defendant could have retreated with
safety—an unwarrantable conclusion under the evidence.    So
held, where the evidence showed that, had defendant turned and
ran the instant he saw one whom he was charged with shooting
coming toward him menacingly with a rock in his hand, he
might have escaped serious injury from the rock thereafter
thrown at him, and still have avoided killing said person; since
this was not called upon to do, under the circumstances shown;
that, since the person shot had thrown the rock and continued
to advance, he had made sufficient demonstration to convince a
reasonably prudent person that he intended to continue the as-
sault and inflict all injury upon defendant that he could.

Whiting, P. J., and McCoy, J., dissenting.

Appeal from Circuit Court, Lawrence County.   HON. JAMES
McNENNY, Judge.

The defendant, Einar Jaukkuri, was convinced of manslaugh-, ter in the second degree, and he appeals.   Reversed. .

*Clarence C. Caldwell,* Attorney. General, and *Francis J. Parker,* State's Attorney, for Respondent.

*Robert C. Hayes, John T. Heffron,* and *Chambers Kellar,* for Appellant.

(2) To point two of the opinion, Appellant cited:

State vs. Bell, (S. D.) 160 N. W. 728; Wharton on Homicide; 3d Edition, secs. 225, 226; Boykin vs. People, 22 Col. 496, 45 Pac. 419; State vs. Lepine, (S. D.) 113 N. W. 1076; State vs. Swift, 14 La. Ann. 839; State vs. Warren, Del. 41 Atl. Rep. 190; State vs. Shippey, 10 Minn. 223.

(3) To point three, Appellant cited:

Carrol vs. State, 23 Ala. 28, 58 Am. Dec. 282.

(4) To point four, Appellant cited:

State vs. Bell (S. D.) 160 N. W. 728; 21 Cyc. 800.

(5) To point five, Respondent cited:

State vs. Jones, 89 Ia. 182, 56 N. W.

POLLEY, J.   Defendant was convicted of manslaughter in the second degree and sentenced to a term of four years in the peniten- tiary.   From the judgment of conviction and an order overruling his motion for a new trial, defendant appeals to this court.

Numerous errors are assigned upon the admission and rejec- tion of evidence, the instructions given and requested instructions refused by the trial court, and the insufficiency of the evidence to support the verdict.

Defendant was charged in the information with the killing of one Martin Conheeney, in the Homestake mine on the night of April 24, 1917.   Defendant admits that he killed Conheeney. at the time and place named in the information, but he claims that such killing was done in the necessary defense of his own person in re- pelling a violent assault made upon him by Conheeney.   Whether the homicide was justifiable or not is presented by the exeception to the sufficiency of the evidence, and a determination of this ques- tion requires an examination of the facts and circumstances sur- rounding the commission of the alleged crime.

The homicide took place in a tunnel, leading through the hill from Lead City on the one side to the town of Terraville on the other.   Through this tunnel is a railroad track, over which ore,

tools, etc., are conveyed by means of an engine and cars. This tunnel is lighted with electric lights and, in addition to the above uses, said company permits its employes, and to some extent the residents in general of Lead City and Terraville, to use the said tunnel as a passageway in going back and forth from one town to the other. The deceased was an employee in the mine, and lived on the Terraville side of the hill. The defendant was engaged as a night watchman, or guard, by the Homestake Company. In addition to looking after the property of said company generally, defendant was required to look after the safety of people passing through the said tunnel; and it was his especial duty to see that no person in an intoxicated condition undertook to go through the said tunnel without an escort, though he testified that he had the privilege of escorting an intoxicated person through the tunnel himself if he so desired. As such guard, defendant was furnished with a pistol which he wore in a holster on a belt. On the evening of the tragedy in question, Conheeney started to go from Lead through the tunnel to his home in Terraville. Defendant saw Conheeney about the time he entered the tunnel, and, believing him to be in an intoxicated condition, followed him into the tunnel at a distance of some 50 to 100 feet. Just what took place immediately following is a matter of dispute. Whether Conheeney was actually drunk at that time was a question in dispute at the trial. There was evidence, undisputed, that he had spent a couple of hours in a saloon just before he started home, and that he took at least one drink over the bar while there.

A witness, J. S. White, who testified for the state, saw and talked with him only a few minutes before he was killed, and said he was drunk at that time, though not so drunk that he could not handle himself. And his conduct just prior to his death was that of a man half crazed by intoxicating liquor.

Defendant testified that, after getting into the tunnel a short distance, Conheeney stopped and commenced urinating; that he (defendant) went up to Conheeney and asked him if he could not wait until he got out of the tunnel; that he told him that just then women and children from Terraville were on their way home from the picture shows in Lead, and that if they should see defendant it would look bad; that Conheeney replied in an insulting manner, telling defendant that it was none of his (defendant's) business. More

words followed, and Conheeney struck defendant with a bottle of wine he was carrying. Then followed a vicious fight, in which both defendant and Conheeney were considerably cut and bruised about the head and face. After the fight had continued some time defendant succeeded in freeing himself from Conheeney, and ran back toward the entrance to the tunnel.

Near the entrance to the tunnel defendant passed the witness White, above mentioned. White said that defendant passed him on the run, and that neither of them spoke to the other; that shortly after he passed defendant he came upon Conheeney; that, when he first saw Conheeney, he had his hat in one hand and, with the other hand, was feeling of his head; that he had two bad cuts on his head, and that his face, coat, shirt, and tie were spotted with blood. In reply to a question by the witness, Conheeney said: "He [meaning the defendant] hit me over the head with the butt of his gun." He told the witness that defendant had knocked him down, but does not appear to have told witness how the fight started or who was the aggressor. The witness then asked deceased to come along home with him, but deceased refused, saying he was going down to the timekeeper's office to report the guard for striking him with his gun. The witness then insisted upon going to the timekeeper's office with Conheeney, but Conheeney refused this service, saying he could attend to his own business. Conheeney then started back toward the entrance to the tunnel, and witness went on through the tunnel to Terraville. Soon after leaving White, Conheeney came to where the ore train was being loaded, and had a conversation with one Bray, who was the engineer on the ore train and who testified for the state. This witness said that Conheeney showed signs of having been in a fight; that he had a rock or piece of ore "two or three inches square" in his hand, and that he inquired for the watchman, and said the watchman had knocked him down.

Soon after defendant had passed the witness White, he entered a boiler room near the entrance to the tunnel, where he found another guard by the name of Hart, who was also a witness for the state. This witness testified that, when defendant came into the boiler room he had no hat, and his coat was torn; that his head was cut and blood was running down the side of his face; that he washed his hands; and witness loaned him a hat. Defendant then asked witness to go with him back into the tunnel and

they started into the tunnel together. They had gone but a short distance when they saw Conheeney, who immediately started towards them on the run. When they saw Conheeney coming, defendant asked witness to go ahead of him, which he did. Conheeney continued on the run until he reached Hart, when Hart made an effort to catch Conheeney with the intention of stopping him, but, in so doing, he slipped and fell to his knees, and Conheeney passed him. Defendant was then some 20 feet behind Hart. Directly after Conheeney passed Hart he threw a rock at defendant. Defendant dodged, or "ducked," as he said, and the stone passed over his head. As he was in the act of rising after he had dodged the rock, he drew his pistol from the holster and fired at Conheeney, the bullet striking him in the head and killing him instantly.

Under the foregoing circumstances, the state contends that the defendant could have avoided the killing of Conheeney without danger to himself, and that the killing was deliberate on the part of defendant.

[1, 2] The only circumstance in the entire transaction that is assigned by the state as indicating any deliberation or premeditation on the part of defendant is as follows: Conheeney, after he had passed Hart, was directly between defendant and Hart, and, just before defendant fired the fatal shot, defendant called out to Hart to "look out" or to "step aside." From this act on the part of the defendant, the state draws the inference that the defendant displayed more coolness and deliberation than a man who believed himself to be the object of a deadly personal assault would exercise. It is true that defendant displayed some presence of mind in warning his friend of danger before he fired the fatal shot, but this is not evidence of a felonious design on the part of defendant. If he were acting upon an honest belief that he was about to be assaulted by Conheeney, he had a right to use such means as he had at hand to protect himself from such assault, and the fact that he exercised sufficient presence of mind to warn his friend, who was then directly in line with Conheeney, of possible danger gives rise to no inference that the danger to defendant was not really apparent. Under the common law and under the statutes of this state, a person who is being assaulted may make such resistance as is sufficient to

repel such assault.  Section 268, Pen. Code; sections 225, 226, Wharton on Hom. (3d Ed.).

[4] The question of self-defense and the circumstances that will justify the taking of human life in repelling a dangerous assault were recently considered by this court in State v. Bell, 38 S. D. 159, 160 N. W. 727, and much that is said in that case is applicable to the facts in this case. It is not material who was the agressor in the first encounter between defendant and Conheeney, nor what the result of that encounter was. Conceding that defendant struck Conheeney over the head with the butt of his pistol, as Conheeney told White that defendant had done, this would not justify Conheeney in taking the law into his own hands and renewing the encounter with defendant on sight.

[5] The state further contends that defendant could have retreated, and in that way saved himself from impending danger without having taken the life of Conheeney. Upon this feature of the case the trial court charged the jury that, it the defendant could have retreated with safety, it was his duty to do so. Under this instruction, whether or not the defendant could have retreated with safety to himself was submitted to the jury as a question of fact, and, in order to have found the defendant guilty, the jury must have believed that, under the circumstances the defendant could have retreated with safety. This conclusion we do not believe is warranted by the evidence. It is true that, had defendant turned and ran the instant he saw Conheeney start toward him, he might have escaped serious injury and still have avoided the killing of Conheeney, but this he was not called upon to do. In the first place, he had no warning that Conheeney intended to assault him, and, in the second place, when he sent Hart on ahead, he was justified in believing that Hart would prevent an assault by Conheeney, even though defendant had known that Conheeney intended to make the assault. After Conheeney passed Hart, defendant was given no opportunity to escape. Had he turned to run before the rock was thrown, he would have incurred the danger of being struck and seriously injured by the rock and, after the rock was thrown, he had no means of knowing that Conheeney did not have another rock with which he could have struck defendant. That defendant was not seeking an encounter with Conheeney is evidenced by the fact that he took Hart with him when he started

back into the tunnel, and this is further evidenced by the fact that, when Conheeney started toward defendant, he sent Hart on ahead, presumably to stop Conheeney and prevent another encounter. But, after Conheeney had passed Hart and thrown the rock at defendant, defendant was not called upon to wait to see whether Conheeney had other missiles to throw or other weapons with which he could inflict injury upon the defendant. After Conheeney had thrown the rock and continued to advance, he had made sufficient demonstration to convince a reasonably prudent person that he intended to continue the assault upon defendant and inflict all the injury upon him that he could.

After a careful examination of all the evidence in the case, we are of the opinion that the defendant was justified, at the time he fired the fatal shot, in the belief that Conheeney was threatening either to kill him or to inflict great bodily injury upon him.

The judgment and order appealed from are reversed.

WHITING, P. J. (dissenting). The jury were correctly instructed as to when one should, and when one need not, retreat if attacked. There was ample evidence from which the jury could find that defendant could have retreated in perfect safety to himself, and also evidence from which the jury could find that there was not imminent danger of serious bodily injury even if he did not retreat. It must be remembered that the rock had been thrown before defendant pulled his gun. When the fatal shot was fired there was no rock in the hands of the attacking party—the most defendant claimed was that he did not know but that deceased had other rocks in his hands or pockets. Defendant had help in the person of Hart and, in view of the fact that defendant unaided had come out victor in the previous fight, he certainly had no reason to fear any serious injury from another fistic encounter. The evidence also showed that, within some five feet of defendant, was a passageway into which he could have retreated and escaped his pursuer. Such being the record before us, we certainly should not set aside the verdict of the jury even though we believe that, if we had been on the jury, our verdict would have been in favor of defendant.

McCOY, J., concurs in the dissent of WHITING, P. J.