Note.—Reported in 204 N. W. 177. See, Headnote (1), American Key-Numbered Digest, Pleading, Key-No. 36(4); 31 Cyc. 87, 242, 247; (2) Mortgages, Key-No. 180, 27 Cyc. 1224 (1926 Anno.)

---

## STATE, Respondent, v. WILCOX, Appellant.

### (204 N. W. 369.)

(File No. 5573.   Opinion filed June 3, 1925.)

**1.  Homicide—Trial—Self Defense—Whether Defendant Acted in Justifiable Defense of His Own Life When He Killed Deceased Held For Jury.**

In murder prosecution, whether defendant acted in justifiable defense of his own life when he killed deceased held for jury.

**2.  Criminal Law—Witnesses—Instructions—Refusal of Instruction on Credibility of Witnesses, Held Reversible Error.**

In murder prosecution, refusal to instruct that, if jury believed that any witness had knowingly sworn falsely to any material matter, that all his testimony might be rejected, held reversible error, where veracity of state's witness was brought in question.

**3.  Criminal Law—Trial—Instructions—Instruction on Reasonable Doubt in Prosecution for Murder, in Which Defendant Claimed Self-defense, Should Have Been Given.**

In murder prosecution, in which defendant claimed self-defense, though court gave instruction on burden of proof, under Rev. Code 1919, Sec. 4900, it was error to refuse instruction that defendant was not required to prove his defense beyond a reasonable doubt, and that if jury had any reasonable doubt that defendant committed homicide in lawful defense of himself, he should be acquitted.

**4.  Criminal Law—Burden of Proof—Trial—Burden of Proof Rests on Prosecution at Every Stage of Trial.**

19—Vol. 48, S. D.

In a criminal case, burden of proof rests ·on prosecution at every stage of trial.

5.   Criminal Law—Instructions—Instruction as to Duty of Each Juror Entertaining a Reasonable Doubt of Defendant's Guilt Should Have Been Given.

In murder prosecution, instruction that, if any juror entertained a reasonable doubt of defendant's guilt, it was his duty not to vote for a verdict of guilty, or be influenced in so voting because a majority of jury should be in favor of a verdict of guilty, should have been given.

6.   Homicide—Instructions—Trial—Defendant's Instruction on Claim of Self-defense Should Have Been Given Under the Evidence.

In murder prosecution, defendant's instruction that at time of shooting he was where he had lawful right to be, and that, if deceased advanced upon him in a threatening manner with a deadly weapon, defendant was not obliged to retreat or consider whether he could safely retreat, but was entitled to stand his ground and meet any attack in such a way as he honestly believed was necessary to save his own life, should have been given under the evidence.

7.   Homicide—Self-defense—Instructions—Instruction Correctly Stating Law of Self-defense Should Have Been Given.

In murder prosecution, instruction that, if defendant, at time of shooting, had reasonable cause to believe that deceased intended to take his life, defendant had a right to prevent accomplishment of such design by any means that appeared reasonably necessary under the circumstances, and that it was not necessary that defendant's danger should have been real or actual, correctly stated law of self-defense, and should have been given.

8.   Criminal Law—Trial—Appeal and Error—Evidence as to Notice Served on Defendant to Vacate Premises Should Have Been Excluded as Immaterial.

In murder prosecution, admission of evidence that notice had been served on defendant and his father to vacate premises which they occupied, and judgment for possession that had been rendered, should have been excluded, where deceased was not a party to proceeding, and which proceeding was not a matter of any concern to him.

9.   Homicide—Res Gestae—Evidence of Threats Made by Defendant Before Homicide Should Have Been Excluded.

In murder prosecution, evidence of threats made by defendant before homicide should have been excluded, where defendant had not mentioned name of deceased, or indicated that he had any ill feeling towards deceased.

10. **Homicide—Trial—Evidence of Where Deceased Lived Should Have Been Excluded as Immaterial.**

In murder prosecution, evidence that deceased lived at some distance from place where homicide took place, and that there was a road running over such place, and that deceased traveled such road frequently, and that he was in habit of carrying gun, should have been excluded as immaterial, since it failed to explain how he happened to be at place where homicide occurred, or why he went immediately to house and got his shotgun at time killing occurred.

11. **Criminal Law—Trial—Evidence, Not Tending to Throw Any Light on Real Issue in Murder Prosecution, Should Have Been Excluded.**

In murder prosecution, evidence of an altercation that took place between defendant's father and companion of deceased just prior to homicide, and that defendant shot such other, and that defendant's father also tried to shoot him, and pistol with which shooting was done and clothes worn by such other at time of killing, should have been excluded as immaterial.

12. **Criminal Law—Appeal and Error—Supreme Court Without Authority to Consider Assignments of Error as to Misconduct on Trial, Where Not Presented by Affidavits.**

Supreme Court was without authority to consider assignments of error as to misconduct of state's attorney, and failure of trial judge to keep him within proper bounds and to maintain order in courtroom during trial, in view of Rev. Code 1919, Secs. 2555, 2556, where such assignments were not presented by affidavits.

Appeal from Circuit Court, Charles Mix County; HON. R. B. TRIPP, Judge.

Frank Wilcox was convicted of murder, and he appeals. Reversed.

*G. M. Caster,* of Lake Andes, and *C. F. Manson,* of White River, for Appellant.

*Buell F. Jones,* Attorney General, for Respondent.

(6) To point six of the opinion, Appellant cited: State v. Hatch, 57 Kan. 420; Runyan v. State, 26 Am. Rep. 52; Board v. United States, 158 U. S. 561; Brown v. United States, 256 U. S. 33.

POLLEY, P. J. This is an appeal from a judgment of conviction on a charge of murder. The homicide on which the prosecution is based occurred on the 26th day of March, 1923, some 9

or 10 miles southwest of Platte, in Charles Mix County, on a farm owned by one Mattie Walters, an Indian woman. This farm had been rented to Eugene Wilcox, the father of appellant, during the season of 1922. There were two dwelling houses on the place, one of which was occupied by said Eugene Wilcox and his family, and the other by Mattie Walters and her husband, Bob Walters, a white man. These houses were some 250 yards apart. During said season of 1922 Eugene Wilcox and appellant raised a field of corn on said farm. When the corn was gathered in the fall, it was stored in a corncrib that stood in the vicinity of the said dwelling houses. This crib was some 40 odd feet in length, and 10 or 12 feet wide, and was divided by a partition. As the corn was gathered, the portion belonging to the Wilcoxes was stored on one side of the crib and the portion belonging to Walters in the other. On the south side of the crib was a door opening into the portion of the crib in which the Wilcoxes' corn was stored.

During the fall or winter differences arose between the two families, and proceedings were had, to the end that, on the 17th day of March, 1923, Mattie Walters recovered a judgment in justice court of the county against Eugene Wilcox for possession of the place. Immediately after the entry of this judgment, Wilcox found a place in Platte to which to move his family and belongings, and proceeded with all reasonable expedition to vacate the Walters place. In order that there be no unnecessary delay in getting his belongings moved, Wilcox provided a temporary crib in the neighborhood where he could store his corn, and in that way get it off the Walters place faster than if he hauled it all the way to Platte. On the evening of March 25th the Wilcoxes loaded two wagons with corn, and left them standing over night near the house where they were living. On the morning of the 26th, Wilcox, with appellant and another son younger than appellant, hitched their teams to these wagons, took them to the temporary crib, unloaded the corn, and returned to the crib to load up again. When they reached the crib, they found the door had been closed, and two boards nailed across it so securely that they could not be removed or the door opened without using a pry of some kind to pry the boards off.

When the Wilcoxes reached the corncrib, Walters and the deceased were in the barn, or corral adjacent to the barn, some dis-

tance to the east of the corncrib. They immediately started towards the crib. They crossed the corral together, but when· they· reached the gate at the west side of the corral they separated. Walters came past the house over to the corncrib, while Kemery, the deceased, went to the house, got a repeating shotgun, and then immediately came toward the southeast corner of the corncrib. As soon as Walters reached the corncrib, he tried to start a quarrel with defendant, but defendant declined to quarrel with him, and started toward the southeast corner of the corncrib. Walters then became involved in an altercation with Eugene Wilcox, and almost immediately thereafter appellant shot and killed Kemery with an automatic pistol he had been carrying in his.pocket.

At the trial appellant admitted that he fired the shot that killed Kemery, but claimed that in so doing he was acting in the justifiable defense of his own life.

Appellant first contends that the evidence is insufficient to support the verdict.

[1] The evidence as to just what took place at the time of the shooting is conflicting in some respects, and ordinarily a new trial should not be granted. On the other hand, we are unable to determine just what evidence the verdict of guilty of murder is based upon. Under the conceded facts in the case, the Wilcoxes had a perfect right to be where they were at the time of the trouble. The corn in the crib belonged to them, and they had a perfect right to remove it in the manner they were removing it, and without interference from any one. Walters had no right to nail up the door of the corncrib, or to interfere with the Wilcoxes, and could have had no motive in doing so other than pure malice. When Walters reached the corncrib, the Wilcoxes were looking for. some instrument with which to pry the boards off the door. He first accosted the appellant.by asking him, "What's the matter with settling up before you go any further?" Appellant replied, "I don't owe you anything." Walters then said, "If you don't, who does?" To which appellant replied, "Talk to the old man," meaning his father. Appellant then turned away and went to the other end of the crib. When about to the southeast corner of the crib he saw the deceased about 50 feet southeast from him with the shotgun in his hands. By that time Walters had become engaged in an altercation with appellant's father, and did not see

or hear what took place between defendant and deceased, and who made the first hostile demonstration is not shown by any testimony on the part of the state. Defendant testified that when he first noticed the deceased he was in the act of firing the shotgun at him, defendant; that he, defendant, as quickly as possible, dropped to his knees, drew his pistol from his pocket, and fired two shots in quick succession at deceased; that the bullet from the second shot struck deceased in the head and killed him. And it is a fact that deceased did fire the shotgun at defendant, and that the charge of shot struck the corner of the corncrib behind where defendant was standing, and at the height of defendant's head from the ground. Under these facts and all the attending circumstances, it was for the jury to say whether defendant was acting in the justifiable defense of his own life when he fired the fatal shot.

[2] At the trial the defendant requested the following instruction:

"The court instructs the jury that if you believe any witness in this case has knowingly sworn falsely to any material matter in the case, you may reject all testimony of such witness."

This instruction was refused, and error is assigned. While, in form this instruction applies equally to the testimony of all witnesses in the case, defendant claims that it is especially applicable to the testimony of the state's witness, Walters. At a coroner's inquest that was held over the body of William Kemery the next day after he was shot, Walters testified that just prior to the shooting Eugene Wilcox had threatened to assault him; that Wilcox shook his fist in his (Walters') face, and called him every vile name he "could lay his tongue to." At the trial, Walters, in narrating this same encounter, testified that Eugene Wilcox tore off one of the boards that he, Walters, had nailed across the door, and threatened to knock his brains out with it. He further testified that after Wilcox tore this board off there was only one board left. When defendant put in his evidence he introduced a photograph of the corncrib that had been taken shortly after the tragedy, and before it is claimed that any change had been made after the tragedy. This photograph shows the two boards across the door just as they had been described by the witness Walters. The state on rebuttal introduced a piece of board in evidence that Walters said was the board that he had nailed across the door, and

that Wilcox tore off and threatened him with. This exhibit is a piece of a hard wood board 5½ inches wide and more than 4 feet long, broken off at one end. Walters then went on the stand in rebuttal, and swore that one of the boards had been longer than the other, and that Wilcox broke off the end of the board that projected beyond the west side of the door, and this, too, notwithstanding the fact that he had testified that one of the Wilcox teams, a team of mules, was standing close to the crib and within two feet of the west side of the door. Defendant claims that these descrepancies in Walters' testimony are too great to be accounted for on the ground of mistake or lack of memory, and that it was error to refuse the requested instruction.

Under the rule announced in State v. Goodnow, 41 S. D. 391, 170 N. W. 661, this instruction should have been given. And what is said in Bank v. Bailey et al, 46 S. D. 547, 195 N. W. 37, is especially applicable to such instruction in this case. True, the Bailey Case had not been reported when this case was tried, but the Goodnow Case should have been followed. In State v. Weston (S. D.), 198 N. W. 826, we sustained the trial court in the refusal of an instruction of this character. Our attention is called to the following language used in that case:

"Whether this instruction should be given or not rests largely in the discretion of the trial court, and it should never be given unless the trial judge strongly suspects that willful false swearing has been done in the case."

This was evidently an inadvertence on the part of the court, for it is not in harmony with the established rule of this court, and is not the law. Where the veracity of witnesses in a case is brought in question, this instruction should be given, and the refusal to give it in this case constitutes reversible error. State v. Raice, 24 S. D. 111, 123 N. W. 708, and cases cited. Stafford v. State, 55 Ga. 592; State v. Perry, 41 W. Va. 641, 24 S. E. 634; Titterington v. State, 75 Neb. 153, 106 N. W. 421; Barber v. State, 75 Neb. 543, 106 N. W. 423; State v. Boyles, 34 Idaho 283, 200 P. 125; Owens v. State, 80 Miss. 499, 32 So. 152; McClellen v. State, 117 Ala. 140, 23 So. 653, Burton v. State, 115 Ala. 1, 22 So. 585; Gibbons v. Terrytory, 5 Okl. Cr. 212, 115 P. 129; State v. Kyle, 14 Wash. 550, 45 P. 147. We adhere to the rule announced in Bank v. Bailey, supra.

The court instructed the jury that:

"Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justified."

[3. 4] Defendant excepted to the giving of this instruction, and requested the giving of the following instruction:

"The court instructs the jury that the phrase 'burden of proving,' as used in section 4900 of our Revised Code, which I have read to you, does not mean what is commonly understood as the burden of proof, and it is not required that the defendant shall produce a preponderance of the evidence in proving circumstances of mitigation, and that justify or excuse the homicide on his part, or that he prove such circumstances of mitigation, justification, or excuse to your satisfaction beyond a reasonable doubt. You are further instructed that if, after considering the evidence, if any, touching the circumstances of mitigation, justification, or excuse on the part of the defendant for the commission of the homicide, together with all of the other evidence in the case, you have any reasonable doubt as to whether the defendant committed the homicide in the lawful defense of himself, when there was a reasonable ground on his part to apprehend a design on the part of the deceased to do him some great bodily injury, and that there was imminent danger of such design being accomplished, you should acquit the defendant."

This instruction was refused, and such refusal is assigned as error. The instruction given by the court is practically in the language of section 4900, Rev. Code 1919, and such an instruction has been upheld by this court. State v. Yokum, 11 S. D. 544, 79 N. W. 835. The ruling in the Yokum Case was sustained on the authority of the earlier cases in New York and California, in which states they have statutes similar to our section 4900. But in the more recent cases those courts have adopted what seems to us to be a more humane and reasonable rule, and which rule is embodied in the instruction requested by defendant. Stokes v. People, 53 N. Y. 167, 13 Am. Rep. 492; People v. Hong Ah Duck, 61 Cal. 395; People v. Raten, 63 Cal. 422; State v. Harris 58

Utah 331, 199 P. 145; State v. Hazlet, 16 N. D. 426, 113 N. W. 374. In the concurring opinion of Rapallo, J., in Stokes v. People, supra, it is said:

"It is a cardinal rule in criminal prosecutions that the burden of proof rests upon the prosecutor; and that if upon the whole evidence, including that of the defense as well as of the prosecution, the jury entertain a reasonable doubt of the guilt of the accused, he is entitled to the benefit of that doubt. The jury must be satisfied on the whole evidence of the guilt of the accused; and it is clear error to charge them, when the prosecution has made out a prima facie case and evidence has been introduced tending to show a defense, that they must convict, unless they are satisfied of the truth of the defense. Such a charge throws the burden of proof upon the prisoner and subjects him to a conviction, though the evidence on his part may have created a reasonable doubt in the minds of the jury as to his guilt. Instead of leaving it to them to determine upon the whole evidence whether his guilt is established beyond a reasonable doubt, it constrains them to convict, unless they are fully satisfied that he has proved his innocence."

In a criminal case the burden of proof rests upon the prosecution at every stage of the trial. While it is incumbent upon the defendant to show justification where his defense is "self-defense," this does not mean that he must prove his defense beyond a reasonable doubt, but only that his evidence must be sufficient to create or leave in the minds of the jury a reasonable doubt as to whether he was justified in taking the life of the deceased. The portion of the opinion in State v. Yokum, supra, holding to the contrary is hereby expressly overruled.

[5] The defendant requested the following instruction:

"The court instructs the jury that if, after consideration of the whole case, any juror entertains a reasonable doubt of the defendant's guilty, it is the duty of such juror so entertaining such doubt not to vote for a verdict of guilty, or be influenced in so voting, for the single reason that a majority of the jury should be in favor of a verdict of guilty."

The court refused to so instruct, and such refusal is assigned as error. The purpose of this instruction is to impress upon each individual juror a sense of his own personal responsibility—that

he is not to vote for a verdict of guilty merely because a majority of the jury vote that way, but only when he himself believes the defendant guilty beyond a reasonable doubt. The instruction should have been given. As was said by the Supreme Court of California in People v. Dole, 122 Cal. 486, 55 P. 581, 68 Am. St. Rep. 50:

"This is a correct statement of the duty of a juror, and should have been given. If any juror needed an instruction upon this point, it was harmful to refuse it; if no juror needed the instruction, it would have been harmless to give it."

The court gave the jury the following instruction:

"For aught that appears from the evidence, the Wilcox people had a right to take away the corn they were moving."

[6] Defendant excepted to this instruction on the ground that it is negative in character, and that it is too narrow and restricted to fully explain the right of the defendant, and, in lieu of such instruction, requested the court to instruct the jury as follows:

"The court instructs the jury that you shall not consider the written notice and judgment admitted in evidence in this case, and heretofore referred to in these instructions, as an evidence that the defendant, Frank Wilcox, did not have a legal right to remove the share of the corn belonging to the defendant, or to the Wilcox people, located in thecorncrib mentioned in the evidence, and I instruct you that, as a matter of law, under the evidence in this case, the defendant, at the time of the shooting, was where he had a lawful right to be. You are further instructed that if you find from the evidence that the deceased, William Kemery, advanced upon the defendant in a threatening manner and with a deadly weapon, and that if you further find that the accused did not provoke the assault and had reasonable ground to believe, and in good faith did believe, the deceased intended, at the time, to take his life or do him great bodily harm, he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground and meet any attack made upon him with a deadly weapon in such way and with such force as, under the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, was necessary to save his own life, or to protect himself from great bodily injury."

This instruction correctly states the law, and should have been given. Under the evidence on behalf of the state, the Wilcoxes had a perfect right to remove their corn just as they were doing. Indeed, they were acting in obedience to the order of a court of competent jurisdiction in so doing. Walters had no right to interfere with them, and it was his unlawful act in nailing up the corncrib door that caused all the trouble and resulted in the death of Kemery.

By a question put to the defendant on cross-examination, and again during his argument to the jury, the state's attorney presented the question of the necessity for the defendant to retreat if he could before he could avail himself of the defense of "self-defense." Under the circumstances shown by all the evidence in this case, the defendant was not required to retreat, and the jury should have been so instructed. Under the evidence on behalf of the state, defendant was not threatened by Kemery with the shotgun, and there was no occasion for defendant to retreat; and under the evidence on behalf of defendant, and on his theory of the case, he had no means of saving his life except by doing exactly what he did. It was error to refuse the requested instruction.

[7] Upon the question of defendant's right to take the life of the deceased, defendant requested the following instruction:

"The court instructs the jury that if the defendant, at the time of the shooting the deceased, had reasonable cause to believe from the words, acts, or conduct of the deceased that deceased had a design to take his life, or to do him great bodily injury, and that such design was about to be accomplished, then the defendant had a right to act on the facts and circumstances, as they appeared to him at the time, and to shoot deceased to prevent the accomplishment of such design, and in this connection you are further instructed that the defendant was not required to nicely gauge or measure the force used, but that he could use any means that appeared reasonably necessary under the circumstances; the court further instructs you that it is not necessary to this defense that defendant's danger should have been real or actual, or that it should have been impending or about to occur, but if the defendant had reasonable cause to believe and did believe these facts,

and shot the deceased to prevent such expected harm, then you must acquit the defendant on the ground of self-defense."

This instruction correctly states the law of self-defense, and should have been given. State v. Bell, 38 S. D. 159, 160 N. W. 727; Wharton, Homicide, § 226.

[8] Over proper objection by defendant, the court admitted in evidence the notice that had been served on defendant and his father to vacate the Walters premises, and also the judgment for possession that had been rendered on the 17th day of March. We are unable to see how this evidence was material to the issue that was being tried. The deceased was not a party to the proceeding; he was not and for some time past had not been living with his mother, and there is nothing in the entire record that suggests that such proceeding was a matter of any concern to him. This evidence should have been excluded, and, if it had been excluded, there would have been no occasion for giving the instruction that is excepted to in assignment No. 21, nor the one set out in assignment No. 22 that was requested by defendant.

[9] Over proper objection by defendant a brother of the deceased was permitted to testify, that some day within a month or two prior to the shooting, defendant pulled a pistol from his pocket and said "he was aching to fill some one full of lead with it." And, over similar objection, a witness was permitted to testify that he had a conversation with defendant some time prior to the shooting, in which defendant complained of some one having cut open some of his bales of hay, and made the remark, "That some of those God damn Injuns would be getting a little shot." Neither of these witnesses claimed that the name of the deceased was mentioned by defendant, or that he accused deceased of cutting open his hay bales, or anything indicating that he had any ill feeling toward the deceased, or that he had him in mind when he was talking about filling people with lead. For that reason this testimony was not material to any issue in the case. It was prejudicial to the rights of defendant, and should have been rejected.

[10] The court, also, over proper objection, permitted the state to show that the deceased lived at some distance west from the Walters place, that there was a road running east and west between the Walters house and the corncrib, that deceased trav-

eled this road quite frequently, that he came to Walters place at will, and that he was in the habit of carrying a gun. We are at a loss to know the materiality of this testimony, unless it was to explain the presence of deceased with his shotgun at the corncrib at the precise time that Walters attempted to force a settlement with the Wilcoxes by nailing the boards across the corncrib door. But it fails to explain how he happened to be in the corral with Walters when the Wilcoxes drove up to the corncrib for another load of corn, or why he went immediately to the house and got his shotgun and went out to the corncrib. This testimony should have been excluded.

[11] At the trial, the court, over defendant's objection, admitted evidence of an altercation that took place at the corncrib between Eugene Wilcox and Walters just prior to the shooting, also evidence that defendant shot Walters, and that Eugene Wilcox tried to shoot Walters. The court also received in evidence the pistol with which the shooting was done, and the clothes worn at the time by Walters. None of this evidence tended in any degree whatever to throw light on the real issue in the case.

The important facts to be considered in the case are: What, if any, demonstration was the deceased making with his shotgun when the defendant fired at him with the pistol? The defendant was not responsible for anything that took place between Eugene Wilcox and Walters, nor was he on trial for the shooting of Walters. Evidence of these transactions should have been excluded.

[12] A considerable number of assignments are based on alleged misconduct of the state's attorney during the trial of the case, and the failure of the trial judge to keep the state's attorney within proper bounds, and to maintain order in the courtroom during the trial. This is one of the matters provided for by the first four subdivisions of section 2555, Rev. Code 1919, and under the provisions of section 2556 must be presented on affidavits. It is not so presented in this case, and for that reason we have no right to consider it.

Upon the whole record in this case, we do not feel that the defendant had a fair trial, and for that reason a new trial is awarded.

The judgment and order appealed from are reversed.

CAMPBELL AND GATES, JJ. (concurring). We concur in the foregoing opinion, except the portion which holds inadmissible the notice to quit, the judgment based thereon, the transaction at the corncrib practically contemporaneous with the fatal shooting in the presence of defendant, including the altercation between Eugene Wilcox and Walters, and the shooting of Walters by defendant.