1998 SD 39

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Thomas PELLEGRINO, Defendant and Appellant.**

**No. 19946.**

Supreme Court of South Dakota.

Argued Oct. 23, 1997.

Decided April 15, 1998.

Rehearing Denied May 22, 1998.

Mark Barnett, Attorney General, Michele K. Bennett, Assistant Attorney General, for plaintiff and appellee.

Michael W. Strain of Morman Law Firm, Sturgis, for defendant and appellant.

Thomas Pellegrino, pro se.

KONENKAMP, Justice.

[¶ 1.] In this appeal, we must decide to what extent a homeowner may use deadly force in defense of home and self. During an argument in his home, defendant fatally shot his unarmed friend. Because he refused to leave and defendant perceived that he behaved in a threatening manner, defendant contends the deceased committed a burglary by unlawfully entering or "remaining" in his dwelling with intent to commit an assault, justifying use of lethal force. The jury was instructed that self-defense in one's home against aggravated assault or kidnapping could justify such force, but the trial court declined to instruct on burglary. Defendant was found guilty of second-degree murder. We conclude the court adequately instructed the jury and that all the other assertions of error are groundless. The conviction is affirmed.

### Facts

[¶ 2.] Pellegrino and Gary McKee, the victim, had been close friends for over ten years. While living out-of-state, Pellegrino visited the McKee family regularly and stayed in their home for extended periods. Pellegrino moved to South Dakota from California in early 1996. He rented a plot of

land from McKee, purchased a trailer house, and placed it near McKee's home.

[¶ 3.] In late January or early February 1996, McKee, Pellegrino, and another friend, Arlon Leetch, were playing cards at McKee's. Pellegrino had been drinking. He wanted to fight McKee, so they went outside. McKee hit Pellegrino, causing him to fall backwards striking his head on a truck bumper. He was knocked unconscious but revived twenty minutes later. McKee's wife washed the blood off a small cut on the back of his head. After this incident, Pellegrino spoke of his outrage and proclaimed he would kill McKee if he ever touched him again.

[¶ 4.] Seven weeks later, Pellegrino's son, Salvatore, arrived from Minneapolis to visit his father. Salvatore went to Arlon Leetch's home to collect a late payment on a debt Leetch owed Pellegrino. Salvatore threatened to break Leetch's arms and legs if he did not pay. Upset, Leetch phoned McKee on March 5, 1996, to ask him to talk with Pellegrino about the debt. McKee agreed. When McKee and Leetch arrived at the trailer, Pellegrino was standing just inside the screen door with a .357 magnum revolver. He had been drinking. Leetch expressed reservations about going inside, but McKee said, "Oh, Tom ain't going to shoot nobody."

[¶ 5.] What happened next is disputed. According to Leetch, as they walked toward the trailer, Pellegrino opened the door allowing them to step in. Salvatore told the jury that Pellegrino told them to stay out, and that he would shoot them if they came in, but he could not remember if Pellegrino nonetheless opened the door for them. Leetch sat at the kitchen table and Salvatore joined him. McKee told Pellegrino to put the gun down. He refused. They argued about pointing the gun. At first, they argued toe to toe, then Pellegrino began backing away. While Pellegrino pointed the loaded weapon at him, McKee moved forward. According to Salvatore, Pellegrino told McKee to leave, but McKee wanted to go fight outside and shoved Pellegrino. Leetch, on the other hand, recalled no physical contact or threats, only the argument about Pellegrino pointing the gun. As McKee stepped closer, Pellegrino pulled the hammer back on the pistol and shot him. The bullet passed through McKee's upper arm, fractured two ribs, entered his chest cavity, and caused massive internal injuries. Pellegrino told Leetch to get McKee to the hospital. Leetch drove him to the Northern Hills General Hospital in Deadwood where doctors performed emergency surgery. McKee died the next morning.

[¶ 6.] After the shooting, Pellegrino and his son went to a friend's home in Sturgis. While there, Pellegrino telephoned McKee's wife to say he had shot McKee, but thought he had just winged him. Pellegrino hid the gun in a snowbank. The police traced his calls and soon arrived at the friend's home. After a bit of persuasion from his friend, Pellegrino surrendered.

[¶ 7.] Pellegrino was indicted on counts of first-degree murder, second-degree murder, and alternative counts of first-degree manslaughter. Trial was scheduled in August, but approximately three weeks beforehand, he sought to dismiss his public defender. The court granted the request. Pellegrino then invoked his right to represent himself. Concerned about his competence and his ability to adequately handle his own defense, the trial court appointed attorney Michael W. Strain to assist him. Pellegrino was found competent to stand trial after undergoing a series of mental evaluations. Trial took place in December 1996 and ended with a verdict of second degree murder and a sentence of mandatory life imprisonment.

[¶ 8.] Pellegrino raises the following self-styled appeal issues: (a) "Was there sufficient court prejudice, forgery, improper indictment, deprivation of constitutional rights, and speedy trial violations to require the matter to be dismissed?" (b) "Did the trial court error [sic] in tolling the 180 day rule because of ineffective counsel and improper commitment to the South Dakota Human Services Center?" (c) "Was it error to not instruct the jury that a burglary is a felony for purposes of self-defense in your home?" (d) "Was the homicide justified as a matter of law?" (e) "Was it error for the court to instruct the jurors that an aggravated assault has to be committed before a person can use deadly force in their own home?" (f) "Is

SDCL 23A–44–5.1(4)(a) unconstitutional in that it forces a defendant to give up his right to a speedy trial to protect his right against unreasonable searches and seizures?"[1]

### Analysis and Decision

[¶ 9.] Trial courts possess broad discretion in instructing the jury. *State v. Rhines*, 1996 SD 55, ¶ 111, 548 N.W.2d 415, 443, *cert. denied*, —— U.S. ——, 117 S.Ct. 522, 136 L.Ed.2d 410; *State v. Bartlett*, 411 N.W.2d 411, 415 (S.D.1987). "Jury instructions are adequate when, considered as a whole, they give the full and correct statement of the law applicable to the case." *State v. Fast Horse*, 490 N.W.2d 496, 499 (S.D.1992)(citing *State v. Grey Owl*, 295 N.W.2d 748, 751 (S.D.1980), *appeal after remand*, 316 N.W.2d 801 (S.D.1982)). Upon proper request, defendants are entitled to instructions on their defense theories if evidence supports them. *State v. Helmer*, 1996 SD 31, ¶ 42, 545 N.W.2d 471, 478; *State v. Blue Thunder*, 466 N.W.2d 613, 620 (S.D. 1991); *State v. Esslinger*, 357 N.W.2d 525, 532 (S.D.1984). To warrant reversal, defendants must show that refusal to grant an instruction was prejudicial, meaning "the jury ... probably would have returned a different verdict if [the] requested instruction had been given." *Rhines*, 1996 SD 55 at ¶ 111, 548 N.W.2d at 443; *Bartlett*, 411 N.W.2d at 415 (quoting *Grey Owl*, 295 N.W.2d at 751).

### 1. Lethal Force in Defense of Home and Self

[¶ 10.] On the right to use lethal force in his home, Pellegrino charges an array of errors which we condense for clarity. His arguments are rooted in the view that "if a person is unlawfully in a home, any force is justified." Our statute governing this point states:

> Homicide is justifiable when committed by any person when resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is.

SDCL 22–16–34. To Pellegrino, the court's instructions unduly confined what he believes is a broad statutory privilege to kill.[2] He seems to argue that if one commits any felony in or upon a home, death may be imposed without qualification, even without apparent necessity. If this is what the statute truly intends, then he may be entitled to acquittal as a matter of law as he asserts. This statute, however, obviously codifies the common law and therefore must be read in comprehension of it and our other statutes controlling the use of deadly force. *Cf. State v. Burns*, 15 Or.App. 552, 516 P.2d 748, 752 (1973)(legislative intent in enacting self-defense statutes was to codify the common law, not create new standard); SDCL 1–1–23 and –24. Even on the frontier in 1877 when this law was first enacted, surely human life was never so lightly valued. Pen.C. 1877, subdiv. 1.

[¶ 11.] The feudal concept of home as castle was borne of an age when inhabitants were compelled to turn their dwellings into fortified strongholds. The idea endures into modern times. *State v. Taylor*, 143 Mo. 150,

---

1. Pellegrino continues his right to represent himself in this appeal. We granted his request to file an extended length brief. Thereafter, he personally wrote forty-four of his fifty page opening brief, leaving counsel six pages. Some of Pellegrino's issues were propounded solely by himself, others were advanced by both he and his attorney. Because some of Pellegrino's theories, along with their many sub-points, are meritless, we will only discuss the legally cognizable issues.

2. Instruction No. 27:

Homicide is justifiable when committed by any person who is resisting an attempt to commit any felony upon him in his dwelling house. The crime of aggravated assault and kidnapping are felonies.

To find justifiable homicide under such circumstances, you must find that Thomas Pellegrino shot Gary McKee while resisting Gary McKee's attempt to cause serious bodily injury to Thomas Pellegrino or attempt to kidnap Thomas Pellegrino while in Thomas Pellegrino's home. (Kidnapping is defined elsewhere in these instructions.)

To find that Thomas Pellegrino was resisting either or both of such attempts, you must find that Thomas Pellegrino reasonably believed Gary McKee was in the process of attempting to cause serious bodily injury to his person or in the process of attempting to kidnap him. A reasonable belief is one in which a reasonably prudent man under the same or similar circumstances would hold, seeing what the defendant saw and knowing what he knew.

44 S.W. 785, 788 (1898). But in our legal tradition, except at its uncivilized beginnings, people were not entitled to kill an assailant unless they honestly and reasonably believed their lives were in danger from assault, "or when a felonious assault is being made upon the house, as to commit a burglary, arson, or other felony therein or against the inmates." *Id.* (quoting Lord Hale in Pleas to the Crown (1 Hale, P.C. 484)); R. Perkins, *Criminal Law* 1022, n. 1 (2d ed. 1969). Over the years, confusion arose from a too broad interpretation of the castle doctrine: under the common law this precept was merely a "limitation on the duty to retreat." *State v. Brookshire,* 353 S.W.2d 681, 690 (Mo.1962), *cert. denied, Brookshire v. Missouri,* 371 U.S. 67, 83 S.Ct. 155, 9 L.Ed.2d 119. Home is a shelter and a refuge, not "a free-fire zone." *State v. Miskimins,* 435 N.W.2d 217, 222 (S.D.1989); *see also State v. Hauge,* 1996 SD 48, ¶ 9, 547 N.W.2d 173, 176 (home—"the last citadel").

[¶ 12.] Pellegrino contends that McKee committed a burglary, and, as a result, deadly force was justified. We find nothing in the record to intimate that McKee had violence in mind when he arrived at the home. Whether he entered uninvited was even open to question. Leetch testified that Pellegrino opened the door to let them in. Salvatore's testimony on this point was contradictory. Even under the defense version, McKee did not enter in a violent or tumultuous manner; he and Leetch simply opened the screen door and stepped inside. In no version did Pellegrino shoot McKee to prevent him from entering, so this was not an instance where a homeowner was attempting to repel a felonious outside intruder. One has no right to later kill a person simply for having made an illegal entry, as that would not be an act in self-protection, but an execution. *See Brookshire,* 353 S.W.2d at 691.

A man has the right to prevent, in his home, the commission of a felony or the infliction on any of its inmates of a personal injury which may result in the loss of life or in great bodily harm. The right is limited to prevention; it does not extend to punishment for an act already committed.... After the deceased had entered, though burglariously, and after he was in the house, the defendant had no right to kill him for the act of entry already committed.

*State v. Sorrentino,* 31 Wyo. 129, 224 P. 420, 422 (1924). *See also* 1 R. Anderson, *Wharton's Criminal Law and Procedure* § 222, at 490 (1957). Wharton's treatise discreetly summarizes the law in this area:

When a dwelling house is entered or attempted to be entered without permission, but without force and without felonious intent, as in the case of a mere trespass, the occupant may use force, if reasonably necessary, to prevent or terminate the trespass. Depending upon the circumstances, it may be necessary in the first instance for the occupant to request the intruder to leave; and, if the request is refused, reasonable force may be used to eject him. But the occupant may not use deadly force as against a mere trespasser, unless the trespasser attempts to commit a forcible felony or unless, when the occupant requests the trespasser to leave or when the occupant uses reasonable force to eject him, the trespasser offers resistance to such a degree as to threaten the occupant's life.

When a person enters the dwelling house of another with the latter's permission, the occupant may thereafter for whatever reason request him to leave; if the request is refused, reasonable force may be used to eject him. But the occupant may not use deadly force unless it is reasonably necessary in self-defense or in preventing a forcible felony.

2 C. Torcia, *Wharton's Criminal Law* § 131, at 220–22 (15th ed. 1994)(footnotes omitted).

[¶ 13.] Pellegrino argues that even if the jury disbelieved his evidence that McKee unlawfully entered the trailer, McKee committed a separate burglary offense by "remaining" there against Pellegrino's declared wishes and with intent to commit a crime.[3]

---

**3.** Pellegrino's Proposed Instruction 3 stated:

The elements of the offense of second degree burglary are:

*See* SDCL 22–32–1 (burglary committed when one "remains in an occupied structure after forming the intent to commit any crime"). Relying upon SDCL 22–16–34 and dictum from *State v. Woods,* 374 N.W.2d 92, 97 (S.D.1985), Pellegrino proposed and the court refused an instruction stating, "Any force used to repel a felonious intruder in your home is considered to be lawful force." This proposal might be correct if we construe the statute rigidly. Yet the term "any felony" in SDCL 22–16–34 must be understood in its historical context. *People v. Martin,* 168 Cal.App.3d 1111, 214 Cal.Rptr. 873, 881 (1985)("any felony" intended to include common law crimes considered felonies).

[¶ 14.] The term felony in former times carried a connotation of greater threat than merely refusing to leave. The common law defined burglary "to be the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." 2 W. LaFave & A. Scott, *Substantive Criminal Law* § 8.13, at 464 (1986); *see* 4 W. Blackstone's Commentaries, p. 224. If we interpret "any felony" in SDCL 22–16–34 literally, one might justifiably be shot while forging a check in someone's home. "[I]n view of the large number of felonies today and the inclusion of many that do not involve a danger of serious bodily harm, a literal reading of the section is undesirable." *People v. Ceballos,* 12 Cal.3d 470, 116 Cal.Rptr. 233, 237, 526 P.2d 241, 244–45 (1974). In the common law, the rule developed that use of lethal force to prevent a felony was only justified if the felony was a "forcible and atrocious crime." W. LaFave & A. Scott, *Criminal Law,* at 406–07 (1972)(footnotes omitted); *People v. Jones,* 191 Cal.App.2d 478, 12 Cal.Rptr. 777, 780 (1961). "Any civilized system of law recognizes the supreme value of human life, and excuses or justifies its taking only in cases of apparent absolute necessity." *Jones,* 12 Cal.Rptr. at 780(victim of felony domestic abuse in home not justified in killing spouse). "Where the character and manner of the burglary do not reasonably create a fear of great bodily harm, there is no cause for the exaction of human life." *Ceballos,* 116 Cal.Rptr. at 238, 526 P.2d at 246.

[¶ 15.] Other jurisdictions with identical or nearly identical statutes to SDCL 22–16–34 decipher this justifiable homicide language as if to include the word "necessary." *State v. Couch,* 52 N.M. 127, 193 P.2d 405, 408 (1946); *Viliborghi v. State,* 45 Ariz. 275, 43 P.2d 210 (1935); *Collegenia v. State,* 9 Okla.Crim. 425, 132 P. 375 (1913). The Florida Supreme Court in *Russell v. State,* 61 Fla. 50, 54 So. 360 (1911), examined its equivalent justifiable homicide statute, which states in part: "When resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person shall be." *Id.,* 54 So. at 361. The Court understood this to mean, "that one assaulted in his dwelling house would not be justified in killing the aggressor, unless he had reasonable ground to believe, and did believe, that unless he killed the aggressor a felony would be committed upon him or her, or upon or in the slayer's dwelling." *Id.* Thus, persons assaulted in their homes may "use the force necessary ... for their protection against the threatened ... harm." *Id.* Such persons "need not retreat, and ... may use all necessary force to eject the intruder, whom [they] may kill in doing it, if this extreme measure appears unavoidable." *Id.* (citation omitted).

[¶ 16.] After carefully examining these cases and our own justifiable homicide statute with its common law ancestry, it is clear that people may defend their dwellings against those who endeavor by violence to enter them and who appear to intend violence to persons inside. When a home is violently assailed by one intent on committing a forcible felony, the inhabitants may repel such intrusion with deadly force if such force appears reasonably necessary. Persons in their own homes assaulted or placed in apparent imminent danger of great

---

1. That Gary McKee entered or remained in a structure described as the trailer house of Tom Pellegrino.

2. That said structure was an occupied structure.

3. That Gary McKee unlawfully entered or unlawfully remained therein with the intent to commit the crime of assault.

personal injury, have the right to stand their ground and meet force with force, even to the extent of taking life if such persons actually believe, and the circumstances and surrounding conditions are such that a reasonably cautious and prudent person would believe, danger of death or great personal injury to be imminent at the hands of the assailant. *See State v. Lepine*, 21 S.D. 500, 503, 113 N.W. 1076, 1077 (1907); *Peele v. State*, 155 Fla. 235, 20 So.2d 120, 121 (1944)(citing *Wilson v. State*, 30 Fla. 234, 11 So. 556, 561 (1892)); *Lightbourn v. State*, 129 Fla. 43, 175 So. 857 (1937); *Russell*, 54 So. at 361. On the other hand, people "do not hold their lives at the mercy of unreasonable fears or excessive caution of others, and if from such motives human life is taken, there is no justification." *Harris v. State*, 104 So.2d 739, 743 (Fla.Dist.Ct.App. 1958).

[¶ 17.] The trial court instructed the jury that "[h]omicide is justifiable when committed by any person who is resisting an attempt to commit any felony upon him in his dwelling house." The court qualified "any felony,"· however, by explaining that "[t]he crimes of aggravated assault and kidnapping are felonies." [4] With the numerous and diverse definitions of the term felony today, we believe it was never the intent of our forebears when this statute was enacted to encompass felonies not involving a danger of serious bodily harm. We would probably agree that ordinarily burglary should be included within this description, if for no other reason than by legislative fiat it is a crime of violence in some instances, but given the peculiar facts of this case, we conclude it was within the trial court's discretion to decline to instruct on it here. *Helmer*, 1996 SD 31 at

4. The court properly defined serious bodily injury and kidnapping in separate instructions.

5. There is authority for the proposition that any force is permissible in defense of home, although not in South Dakota. *See State v. W.J.B.*, 166 W.Va. 602, 276 S.E.2d 550, 554 (1981):
A number of courts with the approval of commentators have taken the position that the occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the

¶ 42, 545 N.W.2d .at 478; *Esslinger*, 357 N.W.2d at 532.

[¶ 18.] As part of his theory on a homeowner's right to exact death within the home, Pellegrino believes the court gave conflicting instructions on self-defense, one on defense of home and another on defense of person: To him, defense within one's home differs simplistically from self-defense in that, unlike self-defense, defense in a dwelling requires no danger to life or great bodily harm.[5] Justice Henderson resolved a similar assertion in *State v. Jaques*, 428 N.W.2d 260 (S.D.1988):

Jaques' main argument, although never stated as such, is that they were justified in using lethal force because the evidence showed that Gray threatened Sitting Crow with serious bodily injury, in his own dwelling, and Instruction No. 62 indicates that force used must be limited to what a reasonable person would believe necessary. As stated in *State v. Woods*, 374 N.W.2d 92, 97 (S.D.1985), "any force ... would have been lawful force" in repelling a burglar from one's home under SDCL 22–16–34. The defendant's point is well taken that the court's jury instructions ... regarding justifiable homicide when opposing a felony within one's dwelling apparently conflicts with the "reasonable force" available under [the self-defense instruction].

This conflict, however, is more of form than substance. The court's instructions, taken as a whole, indicate that the jury could find Jaques not guilty if he reasonably believed he was faced with a felony (serious bodily harm) within the dwelling and killed Gray to prevent the harm.

commission of a felony and the occupant reasonably believes deadly force is necessary. *Thomas v. State*, 255 Ala. 632, 53 So.2d 340 (1951); *People v. Givens*, 26 Ill.2d 371, 186 N.E.2d 225 (1962); *Burks v. Commonwealth*, 254 Ky. 193, 71 S.W.2d 418 (1934); *Lee v. State*, 232 Miss. 717, 100 So.2d 358 (1958); *State v. Couch*, 52 N.M. 127, 193 P.2d 405 (1948); *State v. Reid*, 3 Ohio App.2d 215, 210 N.E.2d 142 (1965); *Wooten v. State*, 171 Tenn. 362, 103 S.W.2d 324 (1937); W. LaFave & A. Scott, *Criminal Law* 400 (1972); R. Perkins, *Criminal Law* 1023–24 (2d ed. 1969).

\* \* \*

[T]he use of force becomes limited to that which is reasonable in the circumstances, and, as the threat of harm dissipates, so does the reasonableness of the force used.... [T]he jury was properly instructed to consider the reasonableness of the force applied by defendants. The court's instructions, taken as a whole, were adequate. Jaques' argument is without merit.

*Id.* at 265. Although we decline to endorse *Woods'* dictum, we conclude as in *Jaques* that the instructions here were adequate. Whether, under the particular facts of each case, homicide was justified is for the jury to decide. *Brown v. State,* 225 Ga.App. 218, 483 S.E.2d 633, 634 (1997); *State v. Clifton,* 880 S.W.2d 737, 743 (Tenn.Crim.App.1994); *Martin v. State,* 610 So.2d 1195, 1197–98 (Ala. Crim.App.1992)(if defendant admits the homicide, justification is a question for the jury). "When attacked in his own house, one may justify or excuse the killing of his assailant if such act is apparently necessary to save his own life or to protect himself from great bodily harm. In such case, it is the question of the law of self-defense and not the law of defense of habitation which is involved." *Brookshire,* 353 S.W.2d at 691(quoting 1 *Wharton's Criminal Law and Procedure, supra* at § 222). *See generally State v. McCombs,* 297 N.C. 151, 253 S.E.2d 906 (1979); *Commonwealth v. Wilkes,* 414 Pa. 246, 199 A.2d 411 (1964), *cert. denied,* 379 U.S. 939, 85 S.Ct. 344, 13 L.Ed.2d 349; *State v. Ivicsics,* 604 S.W.2d 773 (Mo.Ct.App.1980); *Harris v. State,* 104 So.2d 739 (Fla.Dist.Ct. App.1958).

■ [¶ 19.] When a homicide defendant raises self-defense or justification, the State must prove beyond a reasonable doubt that the killing was without authority of law.[6] *Francis v. Franklin,* 471 U.S. 307, 314, 105 S.Ct. 1965, 1971, 85 L.Ed.2d 344, 353 (1985); *State v. Wilcox,* 48 S.D. 289, 297, 204 N.W. 369, 372 (1925). This burden was properly stated in the court's instructions, which gave the jurors the opportunity to find justifiable

homicide if they believed Pellegrino shot McKee while resisting McKee's attempts to do him serious bodily harm or to kidnap him. The jurors heard testimony about Pellegrino's professed fear of McKee, along with evidence on the circumstances immediately preceding the killing. From the facts presented, the jury could have properly reasoned that Pellegrino's belief McKee was about to commit an assault was unreasonable. Even if the jury decided that Pellegrino reasonably believed McKee was about to commit an assault, it could still have found that his belief the shooting was necessary to resist the assault was unreasonable. Based on the evidence and the court's instructions, the jury could fairly conclude that it is one thing to shoot a felonious intruder who enters by night to injure or worse, but it is another thing entirely to shoot as a felon an unarmed friend during an argument in one's home.

## 2. Sufficiency of the Evidence

■ [¶ 20.] When reviewing the sufficiency of the evidence, we are required to view it in a light most favorable to the jury's verdict. *State v. Hage,* 532 N.W.2d 406, 410 (S.D. 1995); *State v. Sondreal,* 459 N.W.2d 435, 438 (S.D.1990).

It is well settled that in determining the sufficiency of evidence on appeal, the question presented is whether or not there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In making such a determination, this court will accept that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict.

*State v. Hart,* 1996 SD 17, ¶ 8, 544 N.W.2d 206, 208; *State v. Huettl,* 379 N.W.2d 298, 301 (S.D.1985). *See also State v. Sprik,* 520 N.W.2d 595, 600 (S.D.1994); *State v. Davi,* 504 N.W.2d 844, 856 (S.D.1993); *State v. Sitting Crow,* 428 N.W.2d 268, 270 (S.D. 1988); *Grey Owl,* 316 N.W.2d at 801.

**6.** A homicide is "without authority of law" if done without justification. SDCL 22–16–32, – 33, –34, and –35.

**[¶ 21.]** A jury's function is to resolve conflicts in the evidence, weigh credibility, and sort out the truth. *Jenner v. Leapley*, 521 N.W.2d 422, 432 (S.D.1994). Viewed in a light most favorable to the jury's verdict, the evidence confirmed that Pellegrino had earlier threatened to shoot McKee, he was angry with McKee, and further, on the day of the homicide, Pellegrino had taken the gun out of his bedroom to make sure it worked. Contrary to Pellegrino's contention, there has been no showing that the verdict was entered in disregard of the evidence. After considering the entire record, we are convinced the evidence was sufficient to sustain the verdict.

### 3. Constitutionality of SDCL 23A–44–5.1(4)(a)

**[¶ 22.]** Pellegrino contends SDCL 23A–44–5.1(4)(a) is unconstitutional as it tolls the rights of defendants to a speedy trial when they seek to protect their rights against unreasonable searches and seizures. He maintains this Court's holding in *State v. Hoffman*, 409 N.W.2d 373 (S.D.1987), supports his proposition. Our analysis in *Hoffman* provided insight into the background and application of the statutory predecessor to the current version of SDCL 23A–44–5.1. Nothing in *Hoffman* implicated statutory infringements upon a defendant's right to a speedy trial. Accordingly, since we conclude *Hoffman* provides no support for Pellegrino's theory, he has failed to cite authority for his argument that SDCL 23A–44–5.1 is unconstitutional. "The failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and the issue is thereby deemed waived." *State v. Knoche*, 515 N.W.2d 834, 840 (S.D. 1994); *State v. Dixon*, 419 N.W.2d 699, 701 (S.D.1988).

### 4. Tolling 180 Day Rule

**[¶ 23.]** In 1991, SDCL 23A–44–5.1 was completely rewritten. *State v. Fowler*, 1996 SD 79, ¶ 12, 552 N.W.2d 391, 393. Subsection 4 of the rule provides that certain periods are to be excluded in computing the 180 days.[7] *Id.* Specifically, subsection 4(a) excludes:

> The period of delay resulting from other proceedings concerning the defendant, including but not limited to an examination and hearing on competency and the period during which he is incompetent to stand trial; the time from filing until final disposition of pretrial motions of the defendant, including motions brought under § 23A–8–3; [and] motions for a change of venue. . . .

The 180–day period commences to run from the date of the defendant's first appearance before a judicial officer on an indictment, information, or complaint. SDCL 23A–44–5.1(2). Subsection 5 provides:

> If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, the defendant shall be entitled to a dismissal with prejudice of the offense charged and any other offense required by law to be joined with the offense charged.

In its findings of fact and conclusions of law, the trial court held that Pellegrino had been brought to trial within 180 days of his first appearance when the periods excluded by 23A–44–5.1(4) were considered. Findings of fact are reviewed using the clearly erroneous standard. *State v. Shilvock–Havird*, 472 N.W.2d 773, 776 (S.D.1991). However, we review the determination of whether the period has expired, as well as what constitutes good cause for delay, under a de novo standard. *Fowler*, 1996 SD 79 at ¶ 10, 552 N.W.2d at 392 (citing *State v. Cooper*, 421 N.W.2d 67, 69 (S.D.1988)).

**[¶ 24.]** Pellegrino first appeared before Judge Warren G. Johnson on March 5, 1996, and on December 2, 1996, the jury trial began. From that 272 days, 139 days are to be excluded as time spent disposing of Pellegrino's pretrial motions and the delay accompanying the competency evaluations. *State v. Webb*, 539 N.W.2d 92, 95 (S.D.1995)("In computing the time for trial, the 180–day rule requires exclusion of delay which is occasioned by the defendant's conduct, such as

---

7. Pellegrino contends the period of time spent in the competency evaluations should not be excluded from the computation of the 180 days since he was not afforded a due process hearing before he was transported to the Human Services Center for evaluation. We find no basis upon which he was entitled to such a hearing, and, accordingly, find his argument meritless.

**600**

delay caused by pretrial motions, ... [and] defendant's competency examinations."). After excluding these periods of delay as enumerated in SDCL 23A–44–5.1(4)(a) and (f), we conclude Pellegrino was brought to trial well within the 180 days allowed by SDCL 23A–44–5.1(1).

### 5. Denial of Fair Trial by Judge and Prosecutor

[¶ 25.] Pellegrino contends that as a direct result of a total deprivation of his constitutional rights, he has been denied his right to a fair trial. Specifically, he maintains that through the combination of the trial judge and the prosecutor conspiring against him, and the inadequate representation by the Northern Hills Public Defender's office, his rights to due process and a fair trial were prejudiced. "This court has consistently held that a defendant is not guaranteed a perfect trial, 'but every accused, innocent or guilty, is entitled to a fair trial.'" *State v. Raymond*, 540 N.W.2d 407, 410 (S.D.1995), *appeal after remand*, 1997 SD 59, 563 N.W.2d 823 (quoting *State v. Logue*, 372 N.W.2d 151, 158 (S.D.1985) and citing *State v. Bennis*, 457 N.W.2d 843, 847 (S.D.1990)). After a thorough review of the record and the proceedings below, we find no merit in Pellegrino's claims that he was denied his right to fair trial by the actions of the trial judge, prosecutor, or the Northern Hills Public Defender's office.

■ [¶ 26.] Pellegrino next asserts the grand jury proceedings were contaminated with forged documents and perjured testimony.[8] Further, he claims these "defects" left the trial court without jurisdiction to try the case. However, Pellegrino points to no concrete evidence to buttress his assertions. In our independent review of the record, we can find nothing to demonstrate that the grand jury proceedings were so tainted. Pellegrino requests this Court to take judicial notice of the perjured testimony purportedly in the grand jury transcripts. Only when a fact is either generally known within a court's territorial jurisdiction or is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned may a court take judicial notice. SDCL 19–10–2. Here, we are dealing with disputed facts and debatable assertions of perjury. We will not take judicial notice of facts subject to controversy, whose source and accuracy cannot be determined.

[¶ 27.] Pellegrino further contends his due process rights were violated when he was denied access to a law library while awaiting trial in the Lawrence County jail. However, he was accorded assistance of court-appointed counsel. Again, after a review of the record, we find no due process violations.

[¶ 28.] We have carefully examined Pellegrino's remaining issues and find them to be without merit.

[¶ 29.] Affirmed.

[¶ 30.] MILLER, C.J., and SABERS, AMUNDSON and GILBERTSON, JJ., concur.

---

8. Pellegrino asks this Court to recognize his expertise in analyzing handwriting. There has, however, been no showing that he has such expertise, nor has it been shown that such expertise, if possessed, would be needed.