1999 SD 65

**Mary HUGHES, Appellant,**

v.

**STANLEY COUNTY SCHOOL BOARD, Appellee.**

**No. 20272.**

Supreme Court of South Dakota.

Considered on Briefs June 2, 1998.

Reassigned April 14, 1999.

Decided May 26, 1999.

Rick Johnson of Johnson, Eklund, Nicholson, Peterson & Fox, Gregory, South Dakota, Attorneys for appellant.

Charles M. Thompson of May, Adam, Gerdes & Thompson, Pierre, South Dakota, Attorneys for appellee.

GILBERTSON, Justice (on reassignment).

[¶ 1.] This is an appeal from a judgment and order of the circuit court, Sixth Judicial Circuit, affirming a decision of the Stanley County School Board (School Board) terminating the contract of Mary Hughes (Hughes) as a school counselor. We reverse and remand, with instructions.

## FACTS

[¶ 2.] Hughes was employed as an elementary school guidance counselor for the Stanley County School District between 1990 and 1997. During her employment, her earlier evaluations were predominately positive. The only concerns expressed in the evaluations dealt with promptness and class preparation. However, in 1996, Hughes was commended for improving on both. She had always been recommended for re-employment by the school administration.

[¶ 3.] In the fall of 1994, M.B., a third grade student, approached Hughes. In her capacity as a guidance counselor, Hughes had worked with M.B. on a number of occasions. M.B. related to Hughes that M.B.'s father, G.B., walked around the house after his showers without a towel. Hughes told M.B. to speak with her mother, F.B., to ask her father to cover up. During a second conversation, M.B. reported her father had touched her in the area of her breast during a playful wrestling match. Hughes described M.B. at the time as having no breast development, but just becoming aware of some of the issues regarding her sexuality. Hughes gave M.B. the same advice as before, to talk to her mother. In a third conversation, M.B. said she had walked in on her father masturbating. Hughes told M.B. to speak to her mother to get her father to be more discreet.

[¶ 4.] The fourth and final conversation occurred in May 1995. M.B. reported her father had asked her to touch his penis. Hughes again gave M.B. the same advice. Hughes testified later she doubted the claims of M.B. because of her history and experience counseling the child. M.B. had a tendency to fabricate or exaggerate the facts. On at least one prior occasion M.B. had spoken untruthfully and Hughes required her to apologize before the class.

[¶ 5.] Throughout this series of conversations, Hughes was aware the School Board had a policy requiring teachers to report suspected child abuse to the school administration. She was also aware of the school policy forbidding teachers to contact the parents to determine the cause of the suspected abuse.

[¶ 6.] After this last conversation, however, Hughes sought advice from the high school counselor on how she should proceed. He agreed with Hughes' assessment of the situation, that M.B. was fabricating the touching incident. Both the high school counselor and Hughes agreed, speaking with the parents was the proper course of action. Hughes spoke with F.B. and G.B. separately to discuss the allegations their daughter had made. Both parents informed Hughes the first three allegations were essentially true and G.B. had

taken steps to avoid any reoccurrence in the future. Both parents insisted the last allegation, regarding the request for M.B. to touch G.B.'s penis, was untrue.

[¶ 7.] Hughes continued to monitor the situation by checking with M.B. on a daily basis. M.B. never related any further incidents with her father. M.B. did tell Hughes that her father was now "wearing a robe and there were no other sexual incidents *ever after that.*"

[¶ 8.] In July 1996, the Stanley County Sheriff's Office began to investigate an alleged sexual assault by G.B. against a neighbor child. As part of the investigation, Hughes was questioned about her conversations with M.B. Hughes related this to the school superintendent, Jerry Kleinsasser (Kleinsasser), who told her to talk to the school principal, Denise Gebur (Gebur), when Gebur returned from vacation. In August 1996, Hughes submitted a written report to Gebur regarding M.B.'s allegations. G.B. ultimately pled guilty to the sexual assault charge arising out of the incident with the neighbor child.

[¶ 9.] On September 3, 1996, Hughes was provided a "Plan of Assistance" by Gebur, designed to provide support, guidance and supervision as a result of the concerns generated from the M.B. incident. However, on September 27, 1996, she was served with a "Notice of Intent to Terminate Employment Relationship." This notice, signed by the superintendent of schools, alleged that she had:

> [V]iolated the written policy of Stanley County School District No. 57–1 as set forth at page 5 in the teacher handbook given to you for the 1994–95 school year under the heading 'Child Abuse/Neglect,'[1] and violated state law concerning the reporting of suspected child abuse, including but not limited to, SDCL 26–8A–3 and SDCL 26–8A–2(8) in the fall of 1994, which failure to report has been recently discovered by the administration and the State of South Dakota.[2]

1. This policy provides:
   "Because of their regular contact with school-age children, school employees are in an excellent position to identify abuse or neglected children. To comply with state law, it is the policy of the Stanley County School District that any teacher or other school employee who suspects that a child under 18 years of age has been neglected or physically abused (including sexual or emotional abuse) shall report orally or in writing to the principal or superintendent who shall then immediately report to the states attorney, Department of Social Services, county sheriff, or city police. The principal or superintendent shall inform the school employee initiating the action within 24 hours in writing that the report has been made. The employee shall make the report directly to the proper authorities if the principal or superintendent fails to do so.
   Reports of child abuse/neglect should include the following information: name, address and age of child; name and address of parent or caretaker; nature and extent of injuries or description of neglect; and any other information that might help establish the cause of injuries or condition.
   School employees shall not contact the child's family or any other persons to determine the cause of the suspected abuse or neglect. It is not the responsibility of the school employees to prove that the child has been abused or neglected, or to determine whether the child is in need of protection. It is only their responsibility to report his/her suspicions of abuse or neglect. Anyone who participates in making a report in accordance with the law and in good faith is immune from any civil or criminal liability that may otherwise arise from the reporting or from any resulting judicial proceeding even if the suspicion is proved to be unfounded."

2. At the time of the initial conversation between M.B. and Hughes, Hughes was beginning her fourth year as a Stanley County School District employee. The actual contract between the School District and Hughes for the 1994–95 school year (the contract the School Board claims was breached) is not in the court file and was not introduced as an exhibit by either party. However, a copy of the 1996–97 school year contract is provided in the record. This contract does contain certain language incorporating the rules of the school district into the contract, but whether this exact language was contained in the 1994–95 contract while assumed, cannot be ascertained for certain. The incorporating provision in the 1996-7 contract states:
   The teacher agrees to perform the duties assigned by the district in accordance with

Initially, she was suspended with pay until a hearing was to be held on the matter. Prior to having been served with the termination notice, Hughes was criminally charged with Failure to Report Child Abuse or Neglected Child under SDCL 26–8A–3 [3] by the Stanley County State's Attorney. According to the testimony of Principal Gebur, the fact Hughes had been criminally charged after the "Plan of Assistance" was provided, led to her termination notice.

[¶ 10.] At the conclusion of Hughes' criminal case, the jury split 11–1 for acquittal resulting in a mistrial. Thereafter, the Stanley County State's Attorney dismissed all charges related to this incident. By the time the criminal trial was held, the School Board had suspended Hughes without pay pending the administrative hearing and hired a replacement.

[¶ 11.] On February 13, 1997, the School Board held a hearing on the "Notice to Terminate." [4] Prior to the hearing, Hughes sought to question the members of the School Board about possible bias. Upon advice of its attorney, the School Board denied Hughes that opportunity. It appears from the record Hughes was concerned about several matters with respect to School Board members: (1) two members of the School Board had children previously counseled by Hughes, resulting in a disagreement with the parents; (2) Hughes felt some members may bring to the deliberations outside information not presented at the hearing; (3) one School Board member was an employee of the South Dakota Department of Social Services, which was involved to some extent in the investigation of this matter; and (4)

Hughes believed the School Board members had pre-determined the result of the case. After the hearing, the School Board voted to issue its "Notice of Termination of Employment Relationship," concluding Hughes had "breached [her] contract of employment." The appeal to the circuit court followed.

[¶ 12.] Before the circuit court, Hughes called the School Board's chairperson, the Superintendent of Schools, Jerry Parkinson (her former supervisor in Court Services) and herself as witnesses. The School Board called no additional witnesses, but introduced several exhibits, including correspondence between the lawyers concerning the scheduling of the hearings, the circuit court order regarding the preliminary injunction, Hughes' employee evaluations from December 1993 to April 1996 and the transcript of the preliminary hearing before the magistrate judge on the criminal charge.

[¶ 13.] At the conclusion of the trial, the circuit court judge affirmed the decision of the School Board. Thereafter, findings of fact and conclusions of law were entered. This appeal followed.

[¶ 14.] Hughes raises three issues in this appeal:

1. Whether SDCL 13–43–15 was the applicable statute to be used as the basis of Hughes' termination.

2. Whether bias caused the School Board to act arbitrarily or abuse its discretion in terminating Hughes.

3. Whether Hughes' actions in not reporting the claim of child abuse and making contact with the child's par-

the rules governing teachers adopted by the district, and in accordance with the provisions of the school laws of the State of South Dakota.

3. SDCL 26–8A–3 makes is a Class 1 misdemeanor for any school counselor (among others) who has reasonable cause to believe a child under eighteen has been abused or neglected, to fail to report such information to the authorities designated in the statute.

4. Three hearings or proceedings make up the appeal record. There is a transcript of the criminal preliminary hearing that was received as an exhibit in the termination proceeding. There is a transcript of the termination hearing before the Stanley County School Board. Finally, there is a transcript of the proceeding before the trial court on appeal from the decision of the School Board to terminate.

ents were violations of school policy and therefore her contract.

## STANDARD OF REVIEW

[¶ 15.] A proceeding in circuit court on an appeal pursuant to SDCL 13–46–1 is a trial de novo. On appeal to the circuit court, the court may determine the legality of that decision. *Strain v. Rapid City School Bd.*, 447 N.W.2d 332, 338 (S.D. 1989). However, great deference is given to the good faith determinations of school boards on decisions of whether to renew a teacher's contract. *Jager v. Ramona Bd. of Educ.*, 444 N.W.2d 21, 25 (S.D.1989). The appeal to the circuit court is not a trial de novo in the true sense of the phrase, as it has the limited function of receiving evidence for the sole purpose of determining the legality, and not the propriety, of the school board's decision. *Riter v. Woonsocket School Dist. No. 55–4*, 504 N.W.2d 572, 574 (S.D.1993). The determination of legality is a two-pronged process: (1) whether the School Board acted legally, and (2) whether the School Board's decision was arbitrary, capricious or an abuse of discretion. *Id.* On appeal to this Court, we review facts under the clearly erroneous standard, however, questions of law are reviewed de novo. *Aman v. Edmunds Cent. Sch. Dist.*, 494 N.W.2d 198, 199 (S.D.1992).

## DECISION

[¶ 16.] **1. Whether SDCL 13–43–15 was the applicable statute to be used as the basis of Hughes' termination.**

[¶ 17.] A number of statutes govern the contractual relationship between school boards and teachers in the State of South Dakota. If a teacher is in or beyond the third full consecutive term of employment in a school district, (therefore considered a "tenured" teacher), the school board must notify the teacher in writing before the third Monday in March preceding the next school term, of its intent not to renew the teacher's contract. SDCL 13–43–9.1. This statute provides a procedure for notifying the teacher of the reasons for the non-renewal and authorizes conferences before the board, superintendent or other administrator. *Id.* Failure to comply with this and other statutes is considered an automatic offer by a school board to renew the contract for the next school year under the same terms and conditions as the current year. SDCL 13–43–10.

[¶ 18.] None of the above provisions affect the ability of a school board to dismiss a teacher for cause. SDCL 13–43–13. Under SDCL 13–43–15, a school board could dismiss a teacher at any time for (1) plain violation of contract; (2) gross immorality; (3) incompetency; or (4) flagrant neglect of duty. This section was repealed by SL 1995, ch. 87, § 74A, effective July 1, 1995.

[¶ 19.] In its place, the South Dakota Legislature adopted SDCL 13–43–6.1, which provides a teacher may be terminated by a school board at any time for "just cause." Besides "just cause" a teacher may also be terminated for: (1) breach of contract; (2) poor performance; (3) incompetence; (4) gross immorality; (5) unprofessional conduct; (6) insubordination; (7) neglect of duty; or (8) violation of any policy or regulation of the school district.

[¶ 20.] This initial issue raised by Hughes misconstrues the decision by the trial court. Hughes argues that the trial court should have applied SDCL 13–43–15 to the facts of this case rather than its successor, SDCL 13–43–6.1. The circuit court in its memorandum opinion found that SDCL 13–43–15 was the applicable statute. This memorandum opinion was subsequently incorporated by reference into the circuit court's findings of fact and conclusions of law. As to this issue, we affirm.

[¶ 21.] **2. Whether bias caused the School Board to act arbitrarily or abuse its discretion in terminating Hughes.**

[¶ 22.] Hughes claims the School Board abused its discretion when it would not allow her attorney to question School

Board members regarding possible bias. At the trial before the circuit court, Ms. Foster, the School Board chairperson at the time of the hearing, testified she denied this request by Hughes based upon the advice of the School Board's counsel. She testified, in her opinion, the questioning was not necessary.

[¶ 23.] Hughes cites no authority for the proposition she should have been entitled to individually question the members of the School Board regarding the possibility of bias on their part prior to the commencement of the hearing. "The failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and the issue is thereby deemed waived." *State v. Pellegrino,* 1998 SD 39, ¶ 22, 577 N.W.2d 590, 599 (citing *State v. Knoche,* 515 N.W.2d 834, 840 (S.D.1994); *State v. Dixon,* 419 N.W.2d 699, 701 (S.D.1988)).

[¶ 24.] **3. Whether Hughes' actions in not reporting the claim of child abuse and making contact with the child's parents were violations of school policy and therefore her contract.**

[¶ 25.] Hughes was terminated by the Stanley County School Board for two purported violations of school policy: (1) failing to report child abuse; and (2) initiating direct contact with the parents of the child making the child abuse report. Based on our review of the record there is no evidentiary basis to support the School Board's finding on the first purported violation and therefore, we reverse on that point. The second violation is not only proven, it is admitted by Hughes.

[¶ 26.] As Hughes was governed by school policy, the following was her contractual obligation in this type of situation:

Because of their regular contact with school-age children, school employees are in an excellent position to *identify* abused or neglected children. To comply with state law, it is the policy of the

Stanley County School District that any teacher or other school employee who *suspects* that a child under 18 years of age has been neglected or physically abused (including sexual or emotional abuse) shall report orally or in writing to the principal or superintendent who shall then immediately report to the states attorney, Department of Social Services, county sheriff, or city police[.]

* * *

School employees shall not contact the child's family or any other persons to determine the cause of the suspected abuse or neglect. It is not the responsibility of the school employees to prove that the child has been abused or neglected, or to determine whether the child is in need of protection. *It is only their responsibility to report his/her suspicions of abuse or neglect . . . .*

(Emphasis added).

[¶ 27.] A review of this policy establishes reporting is subjective to the teacher when that individual teacher "identifies" or "suspects" or "suspicions" abuse.[5] Hughes' subjective opinion was authored by her in a statement given to the Stanley County State's Attorney. After detailing the incidents reported by M.B., Hughes reasoned:

Normally, this would have sent off red flags in my head, and I would have called Social Services immediately. The reason I did not, is [M.B.] has a real problem with the truth. Students and teachers were always talking about her need to exaggerate and to create a crisis. I, likewise, had caught her in untruths and exaggerations. I made her apologize to all the group members for lying on more than one occasion.

[M.B.] also has an insatiable need for attention, and my reaction was that she might be sensationalizing the situation so I would spend more time with her.

5. This is unusual given the objective nature of the reporting requirements under state law (SDCL 26–8A–3) but nevertheless the school policy clearly adopted a subjective require-

ment. It is a questionable policy as the School Board is subject to state law and cannot modify the requirements of the statute.

Throughout the years I have probably spent more counseling time with this one student than any other, because she demands it and revels in it. Teachers would verify this.

[¶ 28.] Neither the School Board nor the circuit court made any findings on a lack of credibility by Hughes. The entire record shows her to be an honest, forthright person. Thus, there is no evidentiary basis to support termination based on the subjective standard found in the language of the school policy.

[¶ 29.] Instead, the School Board and the circuit court seem to focus on the objective standard ordained by the state statute. At trial, the School Board chairperson testified: "[i]t is my opinion that a reasonable person would have suspected abuse, yes." SDCL 26–8A–3 states in part:

> Any ... teacher, school counselor, school official ... who have *reasonable cause to suspect* that a child under the age of eighteen has been abused or neglected as defined in § 26–8A–2 shall report that information in accordance with §§ 26–8A–6, 26–8A–7 and 26–8A–8.... Any person who knows or *has reason to suspect* that a child has been abused or neglected as defined in § 26–8A–2 may report that information as provided in § 26–8A–8.

(Emphasis added). The contract between Hughes and the School District stated in part that Hughes was required to act "in accordance with the provisions of the school laws of the State of South Dakota." Under SDCL 13–43–15 a teacher may be terminated for cause for "violation of contract." Thus, under this contract, a violation of an applicable statute is also a violation of the teaching contract, which could result in dismissal.

[¶ 30.] Reasonable cause is the same as 'probable cause.' *State v. James,* 286 N.W.2d 534, 536 (S.D.1979); *Klingler v. United States,* 409 F.2d 299, 303 (8th Cir.1969); *State v. Harris,* 295 Minn. 38, 202 N.W.2d 878, 881 (1972); *State v. Vermilya,* 395 N.W.2d 151, 152 (N.D.1986). As such, under SDCL 26–8A–3, reasonable cause exists "where the facts and circumstances within the [school counselor's] knowledge, and of which [she has] reasonably trustworthy information, are sufficient in themselves to warrant a belief by a [woman] of reasonable caution that a crime has been or is being committed." *State v. Stuck,* 434 N.W.2d 43, 51 (S.D.1988).

[¶ 31.] Reasonable cause is based on all relevant facts of the case. *State v. Baysinger,* 470 N.W.2d 840, 845–6 (S.D. 1991). In an application of the reasonable cause standard to Hughes, one must view the credibility of Hughes (see above), M.B., the child making the report and her identified perpetrator, her father G.B. The credibility of M.B. as ascertained by Hughes has been detailed above. Hughes also had substantial previous experience in dealing with children. Prior to her employment as a guidance counselor, she worked as a child protection worker for the State of South Dakota, Department of Social Services for four years; in therapeutic foster care at the Pierre Indian Learning Center for two and one-half years; and as a Court Services' Officer for one year. At the time of the circuit court trial and for many years before that, she was a member of the Child Protection Team for Stanley County.

[¶ 32.] In addition, M.B.'s mother testified at the preliminary hearing that when informed by Hughes of M.B.'s sex abuse allegation, mother confronted her husband, G.B. and believed his explanation over the allegations of her daughter. Mother was not convinced M.B. was telling the truth until much later.

[¶ 33.] During this time, the Stanley County School District employed G.B. as a custodian. Hughes knew him. He was also known to Tony Glass, Stanley County School principal who saw G.B. on a daily basis. Glass testified he never saw anything in G.B.'s behavior suggesting an in-

decent disposition toward children and girls in particular..

[¶ 34.] Superintendent Kleinsasser knew and worked with G.B. for eight years. At the preliminary hearing on the criminal charge he was asked:

Q: At anytime during that period of time, did you ever see any indication of any inappropriate behavior by [G.B.] towards young children there?

A: None whatsoever.

[¶ 35.] Up to this time, there never were suspicions aroused in anyone who knew M.B. well. No one ever took her accusations seriously or found G.B.'s conduct towards her cause for concern about sexual abuse. His acts only became known later as a collateral consequence of the successful investigation and prosecution of G.B. for sexual assault of a neighbor child.

[¶ 36.] Nevertheless, this is not a matter of weighing the evidence for and against Hughes to determine if she acted with "reasonable cause" in failing to report M.B.'s allegations. If there was evidence to support the School Board's conclusion she did not act with "reasonable cause," it cannot be found in the appeal record. An empty record cannot be the basis to uphold a board decision even considering def-

erence to the board's good faith determination. *Jager*, 444 N.W.2d at 26.

[¶ 37.] The law does not require Hughes act with the Wisdom of Solomon, the deductive skills of Sherlock Holmes or possess 20–20 hindsight; only that she act reasonably. Reasonable cause or probable cause is not determined with the "benefit of hindsight," it is determined solely by those factors present at the time Hughes was making the determination whether she needed to report the incidents detailed to her by M.B.[6] *See Baysinger*, 470 N.W.2d at 845–6. (In reviewing reasonable cause, "[w]e do not approach the facts separately but rather we view the action of the [person] on the basis of the cumulative effect of such facts in the totality of the circumstances.").

[¶ 38.] If the Legislature had deemed it appropriate to require all such reports by children to teachers and school counselors be reported to the school administration, it could have easily done so.[7] The Legislature chose a middle ground by adopting the reasonable cause standard. In doing so it opted to balance competing public interests. Sexual abuse of children is abhorrent and is perpetrated against those in society who are the least capable of protecting themselves.[8] On the other

---

6. At the time Hughes was attempting to deal with M.B.'s allegations and whether to report them, Hughes did discuss what to do about it with the high school counselor. Hughes was not indifferent to the reports but was clearly uncertain on how to proceed due to M.B.'s history of untruths. There was no attempt to terminate the other counselor because according to the School Board chairperson, the other counselor "did not have direct contact with [M.B.]." With the full benefit of hindsight and all facts now being known, Hughes' course of action was an error in judgment but, based on the record in this case, falls short of becoming a basis for termination based on either the Board's subjective standard or the statutory "reasonable cause" objective standard.

7. This is the position taken by a witness for the Department of Social Services who testified at the preliminary hearing. However, it is clearly at variance with the reasonable

cause standard set forth by the Legislature in SDCL 26–8A–3.

Q: You mean on every possible allegation that comes in, that is the way you would do it, you would report it to Social Services, or somebody?

A: I guess I would, yes.

Q: No matter what the child might say?

A: I would.

8. In *Stratmeyer v. Stratmeyer*, 1997 SD 97, ¶ 13, 567 N.W.2d 220, 222–3, this Court had cause to ponder the effect of sexual abuse on a child.

Imagine being pricked on the arm with a pin. At first, such an intrusion would be disturbing, but with time might seem uneventful. Now imagine the pin carried a dreaded affliction, only discoverable after years of incubation. Such is often the nature of childhood sexual abuse. Many children only realize years later the true signifi-

hand, false reports exist and unfounded accusations can destroy marriages, families and careers of the accused. A distinguished teaching career may also be on the line for improper failure to report. Involuntary termination not only involves disgrace and humiliation, but it may mean the end of the professional career. *See Appeal of Schramm*, 414 N.W.2d 31, 35 (S.D.1987).

[¶ 39.] For the above reasons, we find the circuit court erred in upholding the School Board's determination that Hughes' act of not reporting child abuse was in violation of her contract. We reverse the decision of the circuit court which affirmed the School Board on this issue as it is arbitrary, capricious and an abuse of discretion as there is no evidence to support it.

[¶ 40.] There remains the second accusation of a violation of school policy, which was also relied upon by the School Board as a basis for termination, that being the improper direct contact initiated by Hughes with the parents of M.B. Here the evidentiary basis is far different than the first and in fact is admitted by Hughes. It is unknown if the School Board would have terminated Hughes solely for the violation of going to the parents as it never had to face that determination.

[¶ 41.] We reverse and remand for further proceedings consistent with this opinion.

[¶ 42.] AMUNDSON, Justice, concurs.

[¶ 43.] NEILES, Circuit Judge, concurs in part and concurs in result in part.

[¶ 44.] SABERS, Justice, concurs in result without a writing.

[¶ 45.] KONENKAMP, Justices, concurs in part and dissents in part.

[¶ 46.] NEILES, Circuit Judge, sitting for MILLER, Chief Justice, disqualified.

NEILES, Circuit Judge, (concurring in part and concurring in the result).

[¶ 47.] I concur that the judgment in this case must be reversed, and I specifically concur with the majority in the rationale expressed in the treatment of the first and second issues, but I cannot concur in the Court's treatment of the third issue, for the reasons stated below.

[¶ 48.] Ignored by the majority, but inescapable in its presence, is the fundamental issue that this school board "fired" Hughes from her 1996–97 teacher's contract, claiming a breach of a contract during the 1994–95 school year. However, nowhere in the record did the school board see fit to introduce into evidence the 1994–95 contract which they claim Hughes breached. The trial court, and consequently this Court, are left to speculate as to the terms and conditions of that 1994–95 contract. Nowhere is it explained how school board can terminate a school teacher's contract (the 1996–97 contract) for acts which occurred some two years earlier. How can acts of Hughes, in 1994–95, breach a contract which was not even entered into until probably April or May of 1996, and effective in the fall of 1996? By the time this contract became effective, she had fully complied with the requirements of the school board policy by reporting the alleged acts to her principal and her superintendent. She at no time ever breached the 1996–97 contract. SDCL 13–43–15 and its successor, SDCL 13–43–6.1 set forth the grounds for termination of a teacher for cause, as discussed in Issue 1. While breach of contract is one of those grounds, again, she did not breach the 1996–97 contract.

[¶ 49.] It is true that the school board, in its notice regarding termination, also cited violation of state law as a basis for termination of Ms. Hughes employment. How-

cance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals. For some children, sexual

violation is so traumatic it becomes psychologically self-concealing, if only to preserve sanity.

ever, the board did not terminate her for this reason, and close review of both SDCL 13–43–15 and SDCL 13–43–6.1 reveal that mere violation of state law is not an explicit statutory grounds for termination. Furthermore, the trial court, in its memorandum decision and findings and conclusions, did not rely upon any violation of state law in upholding the action of the school board. Whether or not the school board could terminate her because her actions arguably violated the applicable state law regarding being a mandatory reporter is not before this Court at this time.

[¶ 50.] The fact of the matter is this case should not have been presented before the school board as a breach of contract, but rather the school board, if action was to be taken, should have been limited to seeking to void the contract under either fraud or mistake of fact. *See* SDCL 53–4–1, 53–4–2, 53–4–5 and 53–4–9. *See also Maasjo v. McLaughlin School District # 15–2,* 489 N.W.2d 618 (S.D.1992). The school board should be directed to handle this matter on remand as an action to void the 1996–97 contract for fraud or mistake of fact, and make appropriate findings and conclusions on those grounds.

[¶ 51.] I also must part company from the majority in its interpretation of the school board policy, and specifically, in its conclusion that the policy, as stated, sets up a subjective standard for the teacher to use in deciding whether abuse has occurred. The majority, in footnote 5, correctly identifies that state law (SDCL 26–8A–3) sets up on objective standard, and correctly recognizes that the school board cannot modify the requirements of the statute (at least to make them less stringent), but fails to recognize that the school board, in adopting their policy, prefaced its statement with the qualifier "To comply with state law."

[¶ 52.] As this Court so recently recognized in *Edgemont School District 23–1 v. South Dakota Dept. of Revenue,* 1999 SD 48, ¶ 8, 593 N.W.2d 36, (citing *Dahn v.*

*Trownsell,* 1998 SD 36, ¶ 14, 576 N.W.2d 535, 539):

> The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject. But, in construing statutes together it is presumed that the legislature did not intend an absurd or unreasonable result.

[¶ 53.] Likewise here, this Court must construe the action of the school board together with the action of the legislature. It is absurd and unreasonable to conclude that the school board intended anything other than an objective standard, when they use the phrase, "In order to comply with state law." I would further direct the school board to make findings and conclusions under the state statute guidelines, not the interpretation put on the school policy by the majority. However, I would also suggest that the school board amend their policy to make clear that they are adopting the state law criteria of an objective standard to avoid similar disputes in the future.

[¶ 54.] It should also be recognized that even Hughes had concerns in this case after the fourth report by M.B. Hughes later asserted that she did not believe M.B. because M.B. had a history of telling untruths, but she went on consult with her fellow school guidance counselor and speak with the parents of M.B. When Hughes spoke with the parents of M.B., Hughes knew that the first three incidents reported by M.B. were true, because the parents admitted they were true. Would a reasonable person in that instance at least suspect that child abuse has occurred?

[¶ 55.] For the reasons stated above, I concur only in the result as to the third issue.

KONENKAMP, Justice (concurring in part and dissenting in part).

[¶ 56.] I concur with the majority opinion in all matters, except its unnecessary and improper analysis of Hughes' actions allegedly in violation of state law. The "Notice of Intent to Terminate Employment Relationship" charged Hughes with violating the School Board's written "Child Abuse/Neglect" policy and violating state law requiring the reporting of suspected child abuse. Her contract required her to comply with state law. Although both the Board and the circuit court concluded that she violated the Board's policy, neither made any finding on whether she also violated state law. Nonetheless, the majority opinion proceeds to render its own decision on that question. The majority concludes that even after the child told Hughes that her father asked her to touch his penis, Hughes had no "reasonable cause" to report suspected child abuse as required under South Dakota law. The Board should address that allegation, not us. I would remand that question along with the other issue.